[No. B173829. Second Dist., Div. Six. Sept. 6, 2007.]

EL ESCORIAL OWNERS' ASSOCIATION et al., Plaintiffs and Appellants,
v.
DLC PLASTERING, INC., et al., Defendants and Appellants.

## Counsel

Cappello & Noël, A. Barry Cappello, Troy A. Thielemann and Matthew M. Clarke for Plaintiffs and Appellants.

Hardin & Coffin, Mark T. Coffin, Jeffrey L. Boyle; Driscoll & Reynolds and David E. Driscoll for Defendants and Appellants Coastline Painting & Drywall, Inc., Mid-Cal Painting & Drywall, Inc., and Pyramid Tile Company.

Henderson & Borgeson, Benton, Orr, Duval & Buckingham, Braden & Hinchcliffe and Barton C. Merrill for Defendant and Appellant DLC Plastering, Inc.

Dale, Braden & Hinchcliffe, Kathleen S. Braden, Barton C. Merrill; Adler Law Group and Erwin Adler for Defendant and Appellant Alderman Construction, Inc.

## Opinion

**GILBERT, P. J.**—Defendants are found liable for negligence in a multiparty construction defect case. The trial court gives them partial credits for damages paid in good faith settlements before trial by jointly liable defendants. This assures a fair and appropriate distribution of damages. Plaintiff does not receive a double recovery. Nor do the nonsettling defendants bear a disproportionate share of damages. The trial court has acted within its discretion.

Plaintiff El Escorial Owners' Association (Escorial), a condominium association, appeals a judgment, partially in its favor, in its construction defect action against defendants DLC Plastering, Inc. (DLC), Alderman Construction, Inc. (Alderman), Coastline Painting & Drywall, Inc. (Coastline), Mid-Cal Painting & Drywall, Inc. (Mid-Cal), and Pyramid Tile Company (Pyramid). DLC and Alderman appeal the damage judgments entered against them. Coastline, Mid-Cal, and Pyramid prevailed at trial, but appeal the orders that reduce their attorney fees. Defendant and cross-complainant Investec Construction, Inc. (Investec), which settled and assigned its causes of action to Escorial, appeals and joins on the side of Escorial.

The trial court found that DLC's and Alderman's latent construction defects caused $8.6 million in damages to Escorial. It gave them credits, however, for a prior good faith settlement between Escorial and other contractors. This reduced DLC's and Alderman's combined obligation to

$2,461,495. The court also ruled that Escorial could not maintain a nuisance cause of action for construction defects.

Among other things, we conclude that Escorial did not state a valid nuisance cause of action; the good faith settlement proceedings were adversarial and fair; and the court gave proper settlement credits to DLC and Alderman. The statutes of limitations were tolled pursuant to the Calderon Act (Civ. Code, § 1375). Escorial's action was timely because the construction defects fell within the statute of limitations and there is substantial evidence that Alderman caused damage to Escorial. The trial court properly rejected Alderman's claim that it was exempt from liability because it complied with the project's building plans. We also conclude that the collateral source rule applied, DLC agreed to indemnify the builder, the court properly awarded Escorial its expert fees as damages and did not abuse its discretion by reducing Coastline's, Mid-Cal's and Pyramid's request for attorney fees. We affirm.

## FACTS

Escorial is the condominium association for four, 3-story buildings housing 261 condominiums. These units were originally apartments in a complex owned and operated by another company. Between 1990 and 1996, the apartments were converted to condominiums in a four-phase construction project.

Viola, the initial construction contractor for the condominium conversion, required its subcontractors to sign indemnity agreements to hold Viola harmless for construction defects. Viola's services were terminated before the completion of the project. Investec, the new builder, agreed to complete the construction and required Viola's subcontractors, which included DLC, to sign an assumption agreement. The subcontractors agreed to indemnify the new builder, Investec.

As Investec completed construction, it formed a homeowners association and managed the condominium project. The Investec Management Corporation controlled the daily operations of the association. The Escorial homeowners assumed the management of the condominium association in July of 1995 and on June 15, 1996, "assumed voting control" of the board. Escorial discovered a series of construction defects.

On June 28, 1996, Escorial gave notice that it was proceeding under the Calderon Act (Civ. Code, former § 1375, as added by Stats. 1995, ch. 864, § 1, p. 6579) and demanded that Investec correct numerous construction defects. Escorial and Investec met over the next two years in an attempt to resolve the dispute.

In December of 1998, as negotiations continued, Escorial and Investec signed an agreement to toll the statute of limitations retroactive to December 1, 1996, and prospectively until the end of the negotiations. Ultimately, they were unable to resolve their differences about the repairs.

On March 31, 2000, Escorial filed a construction defect lawsuit against 35 contractors and subcontractors, alleging causes of action for negligence, nuisance, and breach of implied warranties. Defendant Investec cross-complained against its subcontractors for indemnity. Prior to trial, most of the defendants settled. The court approved good faith settlements totaling $10,629,759. Investec and its related entities contributed $5,649,999, and several subcontractors contributed $4,979,760. Escorial proceeded to trial against the subcontractors that did not settle. Investec had assigned its indemnity claims against these subcontractors to Escorial.

The defendants were Pyramid, an installer of bathtubs and windows; Mid-Cal and Coastline, painters; Alderman, a framing contractor; and DLC, a plastering contractor. DLC performed work in the 1991 and 1994 construction phases. Alderman began work in the 1994 and 1996 phases. The parties agreed to a court trial.

For a period covering a year and a half before trial, the trial court approved numerous good faith settlements involving other defendants. These settlements did not specify particular construction defects attributable to any of these settling defendants. During a hearing involving the final settlement, the nonsettling defendants asked the trial court to apportion the amounts of settlement among the various settling contractors and relate those amounts to specific construction defects. In this way, the trial court could decide the extent to which each nonsettling defendant might be entitled to credits should it be found liable at trial.

Instead of continuing the trial date, or reopening the previously approved settlements, the trial court devised a plan. As the evidence unfolded at trial, the court would hold hearings on apportionment during which it would "make the decision on the allocations with the assistance of [Escorial and the nonsettling defendants.]" The parties did not object to this procedure.

As the trial progressed, the court held periodic hearings on apportionment in which the parties presented evidence and registered objections. The court made findings on the apportionment of liability and damages and approved a spreadsheet that listed categories of defects and damages and the amount attributable to each settling party within each category.

*Liability of DLC and Alderman*

Various experts testified at trial. Michael Shotwell, a construction expert, testified that Alderman's framing work was deficient. He said it should have used "metal clips" to "structurally tie" the "upper plates into the walls." Instead, it used nails to create a "nailing ledger," an inadequate structure for the purpose of making that area watertight. As a result, moisture seeped into the walls causing water damage.

The trial court found Alderman was negligent for not making water tight connections "between the newly constructed walls and the original construction." DLC was negligent because its work was not watertight. This caused "water intrusion" and "dry rot" damage.

The trial court rejected DLC's and Alderman's statute of limitations defense. It found their latent construction defects caused damage to interior walls that could not have been discovered by Escorial until 1997. Escorial's lawsuit filed in 2000 was therefore timely. It ruled that the tolling agreement between Investec and Escorial complied with the Calderon Act. It found DLC caused $7 million damages and Alderman caused $1.6 million damages.

*Reducing DLC's and Alderman's Liability by Granting*
*Settlement Credits*

The trial court agreed with DLC and Alderman that they should receive credits based on the allocations in the spreadsheet. The trial court said: "Alderman and DLC were assigned some portion of fault for the exterior wall assemblies [category]. Thus each gets some portion of the good faith settlement. The sum in that column is $1,066,340." The trial court gave Alderman a setoff from that category for $225,000.

The trial court found other categories in the settlement applied to their work. It said: "All of the 'settlement damages' in the following categories are referred to . . . as consequential damages and . . . [DLC and Alderman] . . . are entitled to an offset for all these damages: . . . Landscape etc. $1,189,583 . . . Additional costs $195,341 . . . Construction Management $202,925 . . . Move-Out $3,393,292 . . . Security $91,024 . . . Total $5,072,165." "After considering all the evidence the Court conclude[d] the appropriate amount to subtract from the damages attributable to Alderman for these 'costs' is $1,000,000." It said: "Total offset damages (i.e. from its share of the exterior wall assemblies column and from the total consequential damages columns) are $1,225,000. . . . Total damages after offset for Alderman's negligence is $375,000 (i.e. $1,600,000–$1,225,000.)"

The trial court found that DLC's percentage of work on the project was more than three times that of Alderman's. It awarded DLC $841,340 credit from the "Exterior Wall Assemblies" category and $4,072,165 credit for consequential damages to reduce its liability from $7,000,000 to $2,086,495.

### Attorney Fees and Mid-Cal's Corporate Status

The trial court found that Coastline, Mid-Cal, and Pyramid were not liable and entered judgment in their favor. They filed motions for attorney fees based on fee provisions in the indemnity contracts.

Escorial objected to Mid-Cal's request for fees because its corporate status had been suspended for not paying taxes. The trial court ruled Mid-Cal could recover its costs and attorney fees. Escorial filed objections to the attorney fees claimed by counsel for Coastline, Mid-Cal and Pyramid. It claimed they overbilled and their fees should be apportioned because the contractual attorney fee provision, upon which they relied, authorized fees only for contractual issues.

The Driscoll & Reynolds law firm represented Mid-Cal. They requested $519,109 in attorney fees. The court awarded them $75,000. The Hardin & Coffin law firm, which represented Mid-Cal, Coastline, and Pyramid, sought $897,287 for representing Mid-Cal and Coastline, and $901,065 for representing Pyramid. The court awarded Hardin & Coffin a total fee of $325,000. The court said it had reduced the amount requested by the parties for fees. It found that fees should be apportioned because, "the far majority of attorney time and costs was related to the issues involved in the tort action and thus non-compensable."

### Toxic Mold

The trial court found Escorial failed to prove its claims that the defendants were responsible for toxic mold contamination. It had approved a good faith settlement, which had designated $1,559,943 as damages allocated for toxic mold. But because of Escorial's failure of proof, it found good cause to amend the good faith settlement allocation to remove that category and "reallocate" that amount to four other settlement categories: Decks $5,674, Exterior Walls $464,576, Landscape $471,635 and Move-Out costs $618,558.

### Expert Fees as Damages

The trial court found that Escorial was entitled to recover as damages the amounts it incurred for hiring three experts to investigate the negligence of DLC and Alderman. It found Alderman liable for $50,000 in fees and DLC liable for $75,000.

*Nuisance Cause of Action*

Escorial alleged construction defect causes of action based on negligence and nuisance. The nuisance cause of action incorporated the facts of the negligence cause of action. The trial court ruled Escorial could not obtain recovery for construction defects under a nuisance cause of action.

## DISCUSSION

### *ESCORIAL'S APPEAL*

### I. *Nuisance Cause of Action*

 Escorial contends the trial court erred by rejecting its nuisance cause of action. We disagree. In *City of San Diego v. U.S. Gypsum Co.* (1995) 30 Cal.App.4th 575, 584 [35 Cal.Rptr.2d 876], we concluded that a city could not maintain a nuisance cause of action for asbestos contamination of its buildings. We noted that nuisance is defined as "[a]nything which is injurious to health, . . . indecent or offensive to the senses, or an obstruction to the free use of property . . . ." (Civ. Code, § 3479.) This definition is so broad that it could be " '. . . applied indiscriminately to everything . . . .' " (*City of San Diego*, at p. 585.) We held that the city's asbestos products liability claim should be litigated as a traditional tort, but not as a nuisance cause of action. (*Ibid.*) Any other result would allow nuisance to " 'become a monster that would devour in one gulp the entire law of tort . . . .' " (*Id.* at p. 586.)

Here the trial court found Escorial's "overriding" issue to be toxic mold contamination due to negligent construction, which was analogous to the asbestos claim in *City of San Diego*. Each involves a traditional tort that should not be litigated under "the guise of a nuisance action." (*City of San Diego v. U.S. Gypsum Co., supra*, 30 Cal.App.4th at p. 587.)

Escorial notes that courts have allowed plaintiffs to litigate nuisance causes of action in cases involving housing conditions. (See, e.g., *Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 919 [162 Cal.Rptr. 194] [tenants could pursue nuisance cause of action against landlord for uninhabitable conditions].) But because of the broad definition of nuisance, whether a cause of action is viable depends on the facts of each case. (*Lussier v. San Lorenzo Valley Water Dist.* (1988) 206 Cal.App.3d 92, 104 [253 Cal.Rptr. 470].)

Here the fourth cause of action in Escorial's complaint is labeled nuisance. It contains five one-sentence paragraphs. Two of the paragraphs merely incorporate allegations of the first cause of action, negligence. Escorial alleged that the construction "improvements . . . and other conduct of the

DEFENDANT-DEVELOPERS has created and constitutes a continuing nuisance . . . ." It then quotes the broad statutory definition of nuisance found in Civil Code section 3479. But these conclusory allegations are not sufficient to state a cause of action. (*Haskins v. San Diego County Dept. of Public Welfare* (1980) 100 Cal.App.3d 961, 973 [161 Cal.Rptr. 385].) "[S]ufficient facts must be alleged so that the court may conclude that a nuisance exists within the provisions of the statute. [Citations.]" (*People v. Lim* (1941) 18 Cal.2d 872, 881 [118 P.2d 472].) Escorial neither alleged facts to describe the nuisance nor did it show how this cause of action differed from the first cause of action. A cause of action alleging a continuing nuisance is usually accompanied by a request for an injunction. But Escorial only sought the same monetary relief that it requested in its first cause of action.

■ Here the factual allegations incorporated into the nuisance cause of action involved negligence and defective workmanship. Where negligence and nuisance causes of action rely on the same facts about lack of due care, the nuisance claim is a negligence claim. (*City of San Diego v. U.S. Gypsum Co.*, *supra*, 30 Cal.App.4th at p. 587; *Martinez v. Pacific Bell* (1990) 225 Cal.App.3d 1557, 1565 [275 Cal.Rptr. 878]; *Atherton Condo. Ass'n v. Blume Dev. Co.* (1990) 115 Wn.2d 506, 527 [799 P.2d 250, 263] ["where the alleged nuisance is the result of the defendant's alleged negligent conduct, rules of negligence are applied"].)

The trial court reasonably found that Escorial's nuisance cause of action was merely a clone of the first cause of action using a different label. (*Van Zyl v. Spiegelberg* (1969) 2 Cal.App.3d 367, 372–373 [82 Cal.Rptr. 689]; see also *Atherton Condo. Ass'n v. Blume Dev. Co.*, *supra*, 115 Wn.2d 506, 527 [799 P.2d 250, 263] [in construction defect case "a 'negligence claim presented in the garb of nuisance' need not be considered apart from the negligence claim"].) " ' "The torts of negligence and nuisance . . . frequently are, coexisting and practically inseparable. . . . A nuisance in many, if not in most, instances, especially with respect to buildings or premises, presupposes negligence." . . .' [Citation.]" (*Lussier v. San Lorenzo Valley Water Dist.*, *supra*, 206 Cal.App.3d at p. 104.)

## II. *Mid-Cal's Suspended Corporate Status*

Escorial contends the trial court erred by allowing Mid-Cal to appear in the action and receive its litigation costs because its corporate status was suspended for nonpayment of taxes. It claims Mid-Cal has no standing to appeal and challenge the adequacy of its attorney fee award.

■ A suspended corporation may not prosecute or defend an action. (Rev. & Tax. Code, § 19719, subd. (a); *Reed v. Norman* (1957) 48 Cal.2d 338,

343 [309 P.2d 809].) But there is an exception for insurers. Revenue and Taxation Code section 19719, subdivision (b), states: "This section shall not apply to any insurer, or to counsel retained by an insurer on behalf of the suspended corporation, who provides a defense for a suspended corporation . . . ." The trial court ruled this section authorized Mid-Cal's insurer to hire counsel to appear on behalf of Mid-Cal and to defend the action in Mid-Cal's name. Because Mid-Cal prevailed, the court ruled it was entitled to its litigation costs.

Escorial notes that in *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2006) 136 Cal.App.4th 212, 217 [39 Cal.Rptr.3d 33], the Court of Appeal recently interpreted this section and concluded that, "an insurance company must intervene in the lawsuit to protect the rights of its insured suspended corporation." It may defend in its own name, but not in the name of the suspended corporation.

Escorial claims that it is entitled to default judgment because Mid-Cal's insurer did not intervene. We disagree. Escorial may not prevail solely by retroactively applying a new procedural rule after it had lost on the merits at trial. The insurer did not predict the *Kaufman* decision. To penalize it for not anticipating a change in the law would unfairly punish it "for a lack of extrasensory perception." (*Clemens v. Regents of University of California* (1970) 8 Cal.App.3d 1, 20 [87 Cal.Rptr. 108].) A default would forfeit its rights, a result inconsistent with the statute's remedial goal of protecting insurers that are obligated to defend suspended corporations. (Rev. & Tax. Code, § 19719, subd. (b); *Silberman v. Swoap* (1975) 50 Cal.App.3d 568, 571 [123 Cal.Rptr. 456].)

Moreover, although the order awarding litigation costs to Mid-Cal was entered in Mid-Cal's name when its corporate status had been suspended, that no longer poses a problem. We granted Mid-Cal's request to take judicial notice that on July 25, 2006, the Franchise Tax Board issued a "Certificate of Revivor" certifying that Mid-Cal paid its delinquent taxes and is now a corporation "in good standing." "[A]s to matters occurring prior to judgment the revival of corporate powers has the effect of validating the earlier acts and permitting the corporation to proceed with the action. We are satisfied that the same rule should ordinarily apply with respect to matters occurring subsequent to judgment." (*Peacock Hill Assn. v. Peacock Lagoon Constr. Co.* (1972) 8 Cal.3d 369, 373 [105 Cal.Rptr. 29, 503 P.2d 285].) Mid-Cal may proceed with its appeal. (*Ibid.*)

### III. *Altering the Settlement Allocation*

The trial court approved a series of good faith settlements. It subsequently held additional hearings and approved allocations to categorize the settlement

amounts, including an allocation for toxic mold. But after hearing evidence at trial, it found no liability on that issue and reallocated the amount to other settlement categories.

Escorial and the other appellants claim the reallocation of the credits for toxic mold was erroneous, but for different reasons. DLC and Alderman claim the trial court did not make a valid initial allocation on that issue, therefore there was nothing to reallocate. They note that there were no allocations made by any settling defendants during one and a half years of the good faith settlement process. They claim that because the court had approved those settlements without allocations that (1) it should not have held additional hearings to make the allocations; and (2) that all the allocations the court made were therefore invalid. We disagree for the reasons mentioned in section VII. of our discussion of DLC's and Alderman's appeal.

Escorial claims that the trial court's allocation proceedings were valid. It argues, however, that once the court had approved the allocations, it erred by later modifying the toxic mold allocation. We disagree.

The precision that Escorial seeks may be achieved in many types of cases. But in a complex multiparty construction defect case, a trial court may have to use "rough categories" to initially determine good faith settlement allocations for the various types of construction defects. (*Regan Roofing Co. v. Superior Court* (1994) 21 Cal.App.4th 1685, 1705 [27 Cal.Rptr.2d 62].) Then "after any future trial of plaintiffs' claims against the nonsettling defendants, *the trial court may have to take evidence to calculate the offsets due those defendants, in distinguishing among the various defect categories . . . ."* (*Ibid.*, italics added.) This flexibility is necessary because in settlements involving multiple building trades and multiple construction defects, the allocations may involve "some degree of overlap between trades . . . ." (*Id.* at p. 1704.) Contractors may be individually responsible for some defects and jointly responsible for others. Certain construction defects may be easily identified as the responsibility of one trade while others may be the result of the actions of a variety of contractors. Some types of building damage may span several categories of repair and reconstruction costs. (*Ibid.*) In some cases, "complete precision of allocation" may be achieved only at trial. (*Ibid.*) A trial court must therefore have the latitude to adjust offsets in response to evidence educed in trial.

Here there were numerous settling parties from various construction trades and numerous allocations for a variety of categories of defects, damages and repair costs. But one allocation was based on a claim that was not proven at trial. The trial court, which also presided over settlement proceedings, could not ignore this. In addition, defendants DLC and Alderman specifically

requested the court to make a reallocation because Escorial did not prove its toxic mold claim. Adopting Escorial's position would place the court in a procedural straightjacket. Given the factual circumstances, the trial court's decision to reallocate was not an abuse of discretion. Moreover, Escorial has failed to meet its burden on appeal to show that the reallocations to other categories were not supported by the evidence.

Escorial contends that if trial courts may change the allocations after receiving trial testimony, plaintiffs would not be able to plan a trial strategy. We do not discount plaintiff's interest in planning its trial strategy. But this may not override the trial court's duty. It must adjust credits to insure that nonsettling defendants do not shoulder liability for acts they did not commit or be saddled with excessive and disproportionate damages.

In addition, given Escorial's inadequate evidence on toxic mold, it is not in a position to claim that its trial strategy on that issue was undermined. It received a settlement on a claim for which there was no liability. Nor may Escorial now claim surprise. The court informed the parties at the beginning of trial that it intended to reserve issues involving setting allocations for later proceedings. One defendant requested the court to reserve for all defendants the right to contest the allocations. The trial court granted that request. All parties had notice that because of the complexity of the case, involving numerous defendants, the court might revisit settlement allocation issues.

## IV. *Credits to DLC and Alderman*

Escorial contends the trial court erred by giving too many credits to DLC and Alderman for settlements other defendants made in the good faith settlement. It notes that the judgment implicitly finds they are entitled to credits because their work was related to the work of the settling defendants. But Escorial claims that because the court previously ruled in its statement of decision that some of DLC's and Alderman's work was separate and distinct, they should not receive settlement credits for that work. We disagree.

A statement of decision may be wrong, but the judgment must be affirmed " 'if it is correct on any theory. . . .' " (*Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 610 [92 Cal.Rptr.2d 897].) Escorial relies on isolated trial court remarks that identified particular construction defects caused by either DLC or Alderman. It claims the court refers to the separate and distinct damages caused by DLC and Alderman, but then awards them credits as if they were jointly liable with settling contractors. Escorial claims that the trial court's reasoning is illogical and contrary to case law. But "an appellate court reviews the action of the lower court and not the reasons given for its action; and . . . there can be no prejudicial error from erroneous logic or reasoning if

the decision itself is correct. 'The fact that the action of the court may have been based upon an erroneous theory of the case, or upon an improper or unsound course of reasoning, cannot determine the question of its propriety. . . .' " (*Ibid.*) Moreover, the court also found that the credits it awarded were supported by the evidence. Escorial must therefore cite to the evidence in the record that shows why the credits are incorrect. (*Wilson v. John Crane, Inc.* (2000) 81 Cal.App.4th 847, 866 [97 Cal.Rptr.2d 240]; *Regan Roofing Co. v. Superior Court, supra,* 21 Cal.App.4th at p. 1703.) But because it has not done so, it does not prevail on this issue. (*Wilson,* at p. 866.)

■ In addition, Escorial assumes that for the purpose of awarding credits, DLC and Alderman may not be classified as joint tortfeasors with settling subcontractors that performed work at different times and in diverse areas in the project, or that were not otherwise working in concert with DLC and Alderman. The term "joint tortfeasor" is broad. (*Turcon Construction, Inc. v. Norton-Villiers, Ltd.* (1983) 139 Cal.App.3d 280, 282–283 [188 Cal.Rptr. 580].) It may include nonsettling and settling defendants "joined in a single action regardless of whether their acts were successive or contemporaneous." (*Id.* at p. 283.) In addition, where multiple defendants cause damage and " 'are not acting in concert, if the results produced by their acts are indivisible, each person is held liable for the whole. . . .' " (*Sanchez v. Bay General Hospital* (1981) 116 Cal.App.3d 776, 796 [172 Cal.Rptr. 342].) Consequently, where some of those defendants settle with the plaintiff, the nonsettling defendants are entitled to reduce their liability by deducting the amount of the settlement for those indivisible damages. (*Id.* at pp. 796–797.)

Here Escorial sued DLC, Alderman and the settling contractors and alleged they were responsible for the consequential damages it suffered. The trial court implicitly found that DLC, Alderman and the settling subcontractors caused damage in some separate areas, but they were also jointly responsible for causing indivisible consequential damages to the project as a whole. These included costs for new landscaping, reconstruction costs, repainting, hiring construction managers, paying move-out costs for residents and hiring job site security. The court could reasonably find joint liability because the negligence of these parties "concurred to produce the sum total of the [consequential damages] to the plaintiff." (*Turcon Construction, Inc. v. Norton-Villiers, Ltd., supra,* 139 Cal.App.3d at p. 284.) Escorial has not shown from the record that DLC and Alderman were solely and individually responsible for these consequential costs. Nor has it demonstrated why they should not receive an offset from the consequential costs allocations in the good faith settlement.

■ Moreover, we conclude the trial court acted within its discretion in deciding all the credits to which DLC and Alderman were entitled. (See discussion, *post,* of DLC's and Alderman's appeals, part VII.)

## DLC'S AND ALDERMAN'S APPEALS

### I. *Statute of Limitations*

A. *Calderon Act Tolling*

■ In 1995, the Legislature passed the Calderon Act, which requires common interest development associations to give notice to builders about construction defects before suing. (Civ. Code, § 1375, subd. (a).) Civil Code section 1375, former subdivision (b)(3)(A), italics added, stated: "Except as provided in this section and *notwithstanding any other provision of law*, the notice by the association shall, upon mailing, *toll all statutory and contractual limitations on actions against all parties who may be responsible for the damages claimed, whether named in the notice or not*, including claims for indemnity applicable to the claim, *for a period of 150 days or a longer period agreed to in writing* by the association and the builder." (See Legis. Counsel's Dig., Sen. Bill No. 1029 (1995–1996 Reg. Sess.) 5 Stats. 1995, Summary Dig., p. 369.)[1] The trial court ruled that because the statute of limitations was tolled Escorial could proceed against DLC and Alderman.

■ Alderman contends it is a subcontractor, not the builder, and because it was not a party to the tolling agreement it is not bound by it. We disagree. "Statutes should be given a construction consistent with the legislative purpose . . . ." (*Silberman v. Swoap, supra,* 50 Cal.App.3d at p. 571.) The Calderon Act promotes the goal of encouraging settlements, repairs and discouraging unnecessary litigation. (*Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 43 [21 Cal.Rptr.2d 110].) The broad tolling provisions apply to the builder and "all parties who may be responsible for the damages" whether or not they are named in the notice. (Civ. Code, § 1375, former subd. (b)(3)(A).) To exempt subcontractors is contrary to the Calderon Act's language and would defeat its purpose by discouraging settlements and forcing associations to sue subcontractors before they could complete negotiations with the builder.

DLC and Alderman contend that Escorial's tolling agreement is void because it was signed in 1998 but it extends tolling retroactively to 1996. They claim an agreement to extend tolling must be signed before the end of the 150-day tolling period in the Calderon Act. (Civ. Code, § 1375, former subd. (b)(3)(A).) We disagree.

The Calderon Act provided for an automatic 150-day tolling period, but also allowed the parties to agree in writing to toll statutes of limitations for a "longer period." (Civ. Code, § 1375, former subd. (b)(3)(A).) Its language is

---

[1] The Calderon Act was later amended to extend the period to 180 days.

permissive. It neither limits when the written agreement must be made, nor does it restrict the language the parties may use about the tolling period. Its unique tolling provisions apply "notwithstanding any other provision of law." (*Ibid.*)

█ Adopting appellants' position would add restrictions not found in the statute and impose requirements the parties could not have anticipated. The agreement is consistent with the Calderon Act. It also falls within the policy that allows parties to modify limitations periods to settle cases, even if the agreement is executed after a limitations period expires. (*California First Bank v. Braden* (1989) 216 Cal.App.3d 672, 676 [264 Cal.Rptr. 820]; see also *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995) 38 Cal.App.4th 1532, 1547 [46 Cal.Rptr.2d 33].)

Moreover, the court may well have inferred that the 1998 agreement merely documented the parties' intent to toll the limitations period when they began negotiations. This constitutes substantial compliance with the Calderon Act. Applying appellants' position would lead to "the unjust technical forfeiture" of causes of action. (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 370 [2 Cal.Rptr.3d 655, 73 P.3d 517].) "Where a potential defendant has promised to remedy a portion of the damages suffered by the plaintiff, it would be unreasonable to expect the plaintiff to jeopardize the possibility of repair by filing a lawsuit . . . ." (*Shaffer v. Debbas, supra*, 17 Cal.App.4th at p. 43.)

Appellants note that Escorial gave its Calderon Act notice on June 28, 1996, but did not file its action until March 31, 2000. Escorial argues there are no maximum time limits for tolling in the Calderon Act. It is true that unlimited tolling leads to unreasonable delays and prejudices the rights of subcontractors. Where a homeowners association and a builder unreasonably delay the settlement process or act in bad faith, extending the tolling period to accommodate such conduct undermines the Calderon Act. It would also be prejudicial to subcontractors. In such cases, trial courts may find that an extension of tolling beyond 150 (now 180) days would be inappropriate. (*Campbell v. Graham-Armstrong* (1973) 9 Cal.3d 482, 490 [107 Cal.Rptr. 777, 509 P.2d 689].)

But here appellants have not shown that Escorial's actions were in bad faith or unreasonable. The evidence supports a finding that Escorial's actions fell within the scope of the Calderon Act. After sending its statutory notice, Escorial promptly scheduled an initial meeting to discuss repairs. Thereafter, there "were a series of meetings" on that issue. Through this cooperative process, a substantial number of repairs were made and many repair issues were resolved. The parties ultimately came to the conclusion that further

negotiations would not be fruitful. The trial court could reasonably find that Escorial filed its action in good faith after it had reached an impasse in negotiations.

## B. *Statute of Limitations for Construction Defects*

 DLC and Alderman argue that Escorial's action was barred by the statute of limitations.[2] The statute of limitations for latent construction defects is 10 years from the "completion of the development or improvement . . . ." (Code Civ. Proc., § 337.15, subd. (a).) But where a defect is discovered, a shorter three- or four-year statute of limitations applies. (Code Civ. Proc., §§ 337, 338; *A & B Painting & Drywall, Inc. v. Superior Court* (1994) 25 Cal.App.4th 349, 355 [30 Cal.Rptr.2d 418].) " 'Resolution of a statute of limitations defense normally is a factual question . . . . [Citation.]' " (*FNB Mortgage Corp. v. Pacific General Group* (1999) 76 Cal.App.4th 1116, 1126 [90 Cal.Rptr.2d 841].)

Here the trial court found that Escorial could not have discovered the defects prior to July of 1995 when it first assumed association management. The various structural defects for which appellants were liable were latent and Escorial did not and could not have discovered them before 1997. Escorial's 2000 complaint was timely.

Alderman notes that in 1992 a facilities manager notified the association that some of the buildings did not have "weep screed" devices to keep water off the sides of buildings. It claims this notice started the running of the limitations periods. But the court did not find that evidence to be persuasive. The notice advised the developer about some defects which the trial court found to be patent. Investec controlled the association at that time. The builder, developer, manager and owner "were intertwined" Investec entities. Escorial did not begin to manage the facility until 1995.

Nor was this notice to the homeowners about hidden defects. (*Valenzuela v. Superior Court* (1992) 3 Cal.App.4th 1499, 1503 [5 Cal.Rptr.2d 186].) A case from another jurisdiction reminds us that "[s]tructural quality . . . is nearly impossible to determine by inspection after the house is built, since many of the most important elements . . . are hidden from view." (*Norris v. Church & Co.* (2002) 115 Wn.App. 511, 516, fn. 3 [63 P.3d 153, 156, fn. 3].) Knowledge of obvious defects does not mean homeowners had either the access or ability to detect other deficiencies hidden in multiunit structures or common interior areas. (*Peterson v. Superior Court* (1995) 10 Cal.4th 1185,

---

[2] Hereafter and continuing through parts V. through VIII., the term "appellants" will refer to DLC and Alderman.

1203 [43 Cal.Rptr.2d 836, 899 P.2d 905]; *Baker v. Walker & Walker, Inc.* (1982) 133 Cal.App.3d 746, 763 [184 Cal.Rptr. 245].)

Appellants claim the statute of limitations begins when the Investec entities knew of the defects and their knowledge is imputed to Escorial. But that would allow developers to insulate themselves from liability by controlling the projects until the limitations periods expire. The homeowners who would later take control without knowledge of the defects would have no remedy. The trial court properly rejected appellants' position. (*Standard Fire Ins. Co. v. Spectrum Community Assn.* (2006) 141 Cal.App.4th 1117, 1140 [46 Cal.Rptr.3d 804]; *Valenzuela v. Superior Court, supra,* 3 Cal.App.4th at p. 1503.)

DLC contends that even if the statute of limitations began to run in 1996, it expired before Escorial filed its action. It argues that: (1) after Escorial gave the Calderon Act notice, there was an automatic 150-day statutory tolling period that lapsed on November 25, 1996; (2) Escorial had until November 25, 1999, to file suit; but (3) it did not file until March 2000, which was four months too late. We disagree.

DLC assumes the tolling agreement is invalid. But we rejected that claim in point I.A. above. And DLC has not shown why that agreement could not operate prospectively from December of 1998 to toll the limitations period until Escorial filed its action. (*California First Bank v. Braden, supra,* 216 Cal.App.3d at p. 676.) But tolling aside, the result does not change because DLC and Alderman have not shown that the trial court erred in finding their latent defects were not discoverable before 1997.

## II. *Did Alderman Cause Damage? Sufficiency of the Evidence*

Alderman contends there is no substantial evidence that it caused any damage to Escorial. We disagree. We presume the evidence supports every finding of fact unless appellant demonstrates otherwise, and we must draw all reasonable inferences from the record to support the judgment. (*Glendale Fed. Sav. & Loan v. Marina View Heights Dev. Co., supra,* 66 Cal.App.3d at p. 152.)

■ Contractors must use reasonable skill and judgment. (*Windham at Carmel Mountain Ranch Assn. v. Superior Court* (2003) 109 Cal.App.4th 1162, 1169 [135 Cal.Rptr.2d 834].) They must make sure that their construction work does not cause water damage to buildings. (*Aced v. Hobbs-Sesack Plumbing Co.* (1961) 55 Cal.2d 573, 583 [12 Cal.Rptr. 257, 360 P.2d 897]; *Kuitems v. Covell* (1951) 104 Cal.App.2d 482, 485 [231 P.2d 552].) Here

Shotwell testified that Alderman's deficient work caused moisture to accumulate inside the walls, nails to rust, "heads" to deteriorate and structural water damage to the building. That supports the trial court's findings on negligence, causation and damages.

Alderman claims other evidence in the record supports a different result. But we do not weigh the evidence or resolve evidentiary conflicts. (*Eidsmore v. RBB, Inc.* (1994) 25 Cal.App.4th 189, 195 [30 Cal.Rptr.2d 357].) From Shotwell's testimony alone, the court could draw the reasonable inferences necessary to support the judgment.

### III. *Alderman's Exemption From Liability*

Alderman contends it is exempt from liability because it followed the plans and specifications for the construction project. Here the trial court found that Alderman was negligent because it did not secure a "water tight connection between newly constructed walls and the original construction." Alderman concedes that "the plans did not detail how Alderman was to attach" these structures. The trial court could reasonably infer that was Alderman's responsibility. The cases upon which Alderman relies that hold subcontractors who followed detailed construction plans are insulated from liability are therefore inapposite.

 The issue is whether Alderman's work complied with the legal standard of "due care." (*Bouse v. Madonna Construction Co.* (1962) 201 Cal.App.2d 26, 30 [19 Cal.Rptr. 823].) Alderman is not exempt from liability for defective work because it had a duty implied by law to make sure that it did not damage the condominium complex. (*Windham at Carmel Mountain Ranch Assn. v. Superior Court, supra,* 109 Cal.App.4th at p. 1169.) " ' "Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort as well as a breach of the contract." ' " (*Kuitems v. Covell, supra,* 104 Cal.App.2d at p. 485; see also *Aced v. Hobbs-Sesack Plumbing Co., supra,* 55 Cal.2d at p. 583.) Alderman is liable because there is substantial evidence that its work fell below the due care standard. (*Aced,* at p. 583; *Bouse,* at p. 30.)

Alderman notes that the building inspector approved the work. But that does not change the result. (*Firemen's Ins. Co. v. Indermill* (1960) 182 Cal.App.2d 339, 342–343 [6 Cal.Rptr. 469] [building inspector's approval did not insulate contractors from liability for defective work].)

## IV. *The Collateral Source Rule*

DLC and Alderman contend that the trial court erred by applying the collateral source rule, which allowed Investec and Escorial to be unjustly enriched by insurance proceeds. We disagree.

The collateral source rule prevents tort defendants from reducing their liability by disclosing that plaintiff received compensation from an insurance company. (*Patent Scaffolding Co. v. William Simpson Const. Co.* (1967) 256 Cal.App.2d 506, 510 [64 Cal.Rptr. 187].) This rule applies where homeowners sue contractors for negligence and breach of contract for property damage caused by construction defects. (*Shaffer v. Debbas, supra,* 17 Cal.App.4th at p. 40.) " '[W]here a person suffers property damage, the amount of damages shall not be reduced by the receipt by him of payment for his loss from a source wholly independent of the person who caused the injury.' " (*Ibid.*)

Investec sued DLC on an express indemnity theory and assigned its indemnity rights to Escorial. DLC argues that the collateral source rule "has no application in an express indemnity setting" because it is a contract cause of action. The collateral source rule "has not been generally applied in cases founded upon breach of contract . . . ." (*Patent Scaffolding Co. v. William Simpson Const. Co., supra,* 256 Cal.App.2d at p. 511.) It does apply, however, where the plaintiff sues for breach of contract and the underlying conduct involves a tort. (*Ibid.*) It also applies in a construction defect case based on combined tort and contract claims. (*Shaffer v. Debbas, supra,* 17 Cal.App.4th at p. 40.)

Here the trial court found that the underlying claim against DLC and Alderman "is based upon negligence and causation." Escorial had to prove these elements to prevail. Most causes of action in Escorial's complaint were for tort liability and a substantial part of appellants' defense was they were not negligent.

## V. *DLC's Assumption Agreement*

DLC contends the trial court erred by finding it had a contractual obligation to indemnify Investec for construction defects. It claims it only signed an indemnity agreement with Viola, the initial contractor. We disagree.

We interpret contracts to determine the intent of the parties. (*Beard v. Goodrich* (2003) 110 Cal.App.4th 1031, 1038 [2 Cal.Rptr.3d 160].) The standard is "what a reasonable person would believe" the parties intended. (*Ibid.*)

Here the indemnity agreement with Viola obligated DLC to "indemnify and save harmless owner and contractor . . . from any and *all claims . . . arising out of or in connection with subcontractor's obligations to be performed under* th[e] agreement, but not limited to . . . [p]ersonal injury . . . *and/or damage to property* . . . caused . . . by any negligent act or omission of Subcontractor . . . ." (Italics added.) The trial court reasonably interpreted the agreement's broad language to cover construction defects. It properly rejected DLC's claim that it was limited to personal injury claims.

DLC later signed an "assumption agreement" with Investec after Viola's construction contract was terminated. It stated, in relevant part, Investec "hereby assumes and agrees to perform and discharge all duties of Viola under the Subcontract" with DLC. "Subcontractor [DLC] hereby accepts the assumption of the Subcontract by Builder [Investec]. From and after the date hereof, Subcontractor agrees to perform all obligations under the Subcontract to Builder as [if] the Builder was the General Contractor [Viola] named therein."

 The trial court found the assumption agreement was an assignment of the rights Viola had obtained from DLC to Investec. Parties may contractually assign and assume the obligations of a prior contract. (*Continental Casualty Co. v. Hartford Acc. & Indem. Co.* (1966) 243 Cal.App.2d 565, 571 [52 Cal.Rptr. 533].) Escorial argues "[b]ecause the subcontract between DLC and Viola contains an indemnity obligation and the . . . assumption puts Investec in the same shoes as Viola, . . . DLC is obligated to indemnify Investec." That interpretation is consistent with the language and purpose of these agreements, to provide Investec with the same guarantees that Viola obtained from DLC. DLC unequivocally agreed to "the assumption of the Subcontract" by Investec. There is no language to suggest its obligations to Investec would be different from those it promised Viola.

 Nor is there anything to support the claim that the indemnity provision may be ignored. It is part of the subcontract that is incorporated into the assumption agreement. "Effect must be given to writings incorporated into the contract . . . ." (*Oberg v. City of Los Angeles* (1955) 132 Cal.App.2d 151, 159 [281 P.2d 591].) To adopt DLC's position would allow it to receive the benefit of the contract with Investec, yet avoid its contractual duty to indemnify it for its defective work. But " '[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it . . . .' " (*Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1289 [87 Cal.Rptr.2d 497].)

DLC claims that Myra Chavez, one of its "principals," testified that the two agreements were separate and unrelated. But her subjective interpretation

is not dispositive. (*Beard v. Goodrich, supra,* 110 Cal.App.4th at p. 1038.) Moreover, on cross-examination, she admitted the assumption agreement was "part of" the "prior subcontract between DLC and Viola." The trial court could reasonably infer that her other testimony, upon which DLC now relies, was not credible. It could resolve any conflicts in her testimony against appellant. (*Eidsmore v. RBB, Inc., supra,* 25 Cal.App.4th at p. 195.) "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court. [Citations.]" (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [243 Cal.Rptr. 902, 749 P.2d 339].)

## VI. *Expert Fees as Damages*

DLC and Alderman claim the trial court erred in relying on *Stearman v. Centex Homes* (2000) 78 Cal.App.4th 611 [92 Cal.Rptr.2d 761], in awarding Escorial expert fees as damages. We disagree.

In *Stearman,* the court held that prevailing tort plaintiffs in a construction defect case who incurred fees for hiring experts are "entitled to be made whole." (*Stearman v. Centex Homes, supra,* 78 Cal.App.4th at p. 625.) It ruled that expert fees incurred for repair or expert investigative services, that were not litigation costs, may be awarded as part of the tort damages.

DLC and Alderman contend Escorial's experts were not hired to assist in making repairs, they were employed to testify at trial and therefore *Stearman* does not apply. They cite to portions of the testimony of Escorial's experts, David Jolly, Shotwell and Bart Mendel, and claim: (1) Jolly prepared a repair estimate solely for litigation purposes, (2) Shotwell was not hired to deal with repairs, and (3) Mendel was hired to assist the litigation team. But Jolly testified his estimate went "beyond merely being an estimate for the purposes of litigation." It was an "outline" of "what has to be done" for repairs. Shotwell testified, "we concentrated very . . . heavily on repair methodology . . . ." Mendel testified that he and the other experts worked on repair evaluations.

Appellants do not meet their burden on appeal. They cite to evidence supporting their position, but omit evidence supporting the judgment. (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 152 [135 Cal.Rptr. 802].) We presume the trial court resolved all conflicts and inconsistencies in the testimony of Escorial's experts against appellants. (*Eidsmore v. RBB, Inc., supra,* 25 Cal.App.4th at p. 195.)

DLC argues that the court did not make a necessary finding that the experts were trying to "formulate an appropriate repair plan" and there is no evidence to support such a finding. We disagree. Mendel testified, "all of the expert team . . . worked very closely together *in formulating recommended scopes of repair.*" (Italics added.) The trial court could reasonably infer their services fell within *Stearman.*

Moreover, although the experts in *Stearman* made repair plans, the doctrine of awarding expert fees as damages is not confined to the unique facts of that case. Other decisions have applied the doctrine more broadly to include expenses for retaining experts to evaluate a party's claim or to discover construction defects. (*Apple Valley Unified School Dist. v. Vavrinek, Trine, Day & Co.* (2002) 98 Cal.App.4th 934, 949 [120 Cal.Rptr.2d 629]; *Regan Roofing Co. v. Superior Court, supra,* 21 Cal.App.4th at p. 1708.) Appellants have not shown why the trial court could not alternatively infer that the expert services fell within these categories.

Appellants argue it was error not to apportion these expert costs to the other settling defendants. But the court found the only fees it awarded were directly attributable to each contractor. Appellants have not shown that these findings were erroneous, that the fees were unreasonable, or that an apportionment was required.

## VII. *Good Faith Settlement and Credits*

DLC and Alderman claim the court approved a good faith settlement without a proper adversarial process to determine settlement allocations for categories of defects. They argue that the procedure the court used was unfair, they were denied an opportunity to challenge the allocations, they did not receive all the settlement credits to which they were entitled and consequently their liability should be zero. But because appellants have not cited to the record to describe the proceedings on settlement allocations, they have waived their argument. (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co., supra,* 66 Cal.App.3d at p. 152.)

 But even on the merits, the result is the same. A good faith settlement allows the settling defendants to be free from claims of contribution or comparative indemnity. (*Regan Roofing Co. v. Superior Court, supra,* 21 Cal.App.4th at p. 1700.) But a settlement allocation between the settling parties may "affect the ultimate setoff or credit that a nonsettling defendant will receive against any future judgment . . . ." (*Id.* at p. 1702.) Thus the party seeking confirmation of a settlement must show "the allocation was reached in a sufficiently adversarial manner to justify a presumption that the valuation reached was reasonable. [Citations.]" (*Id.* at p. 1701.)

"[T]he court . . . [is] not required to conduct an evidentiary hearing on the basis for the allocation . . . ." (*Regan Roofing Co. v. Superior Court, supra*, 21 Cal.App.4th at p. 1701.) The settlement amounts are rough approximations of liability and the settling parties need not "set forth a factual matrix showing the allocation by trade or by defendant . . . ." (*Id.* at p. 1704.) But the court must allow the nonsettling defendants to challenge the settlement. It is "accorded wide discretion to control '. . . the procedure' applicable to any challenges to the valuation placed on the settlement by the settling party. [Citation.]" (*Id.* at p. 1701.) " '[A]ny challenge . . . should not be interpreted as giving the challenging defendant a right to a minitrial on the valuation issue. . . .' " (*Id.* at p. 1702.)

Here the settlement proceedings were adversarial and appellants had multiple opportunities to challenge the settlements. Between 2001 and 2003, numerous settling defendants submitted good faith settlement applications. DLC and Alderman had the right to contest each settlement. (Code Civ. Proc., § 877.6, subd. (a)(2).) But they rarely did. In 2002, Alderman filed a motion to challenge a $200,000 settlement by Crittenden Engineering. The court approved the settlement only after a contested hearing where it considered repair estimates, categories of defects and declarations by experts.

DLC and Alderman contend that the court erred by first approving good faith settlements and then holding additional hearings to apportion settlement amounts. We agree with Escorial that they are estopped to complain. At the beginning of the trial, the court announced that it would approve the last good faith settlement. It then outlined a procedure for settlement allocations. DLC and Alderman did not object. " 'An appellate court will ordinarily not consider procedural defects or erroneous rulings . . . where an objection could have been, but was not . . . presented . . . .' " (*In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 1002 [64 Cal.Rptr.2d 383].)

But even on the merits, appellants' claim fails. The trial court subsequently required Escorial to file a detailed settlement spreadsheet with specific allocations. Escorial's spreadsheet contained 21 categories of repair costs and was accompanied by a declaration explaining how the allocations were calculated. The sheet listed the total dollar amounts of the various settlement allocations for each of the settling defendants categorized by the proportional amount allocated to the various categories of defects, repairs and consequential costs. For example, *Taft Electric* total settlement: $60,000, allocations: Electrical $57,600, Constr. Mgt. $1,200, Security Costs $600, Investigative Costs $600; *Specialty Team Plastering* total settlement: $500,000, allocations: Exterior Wall Assemblies, $207,500, Landscape Fencing & Drainage $35,000, Additional Costs Relative to Reconstruction $10,000, Constr. Mgt. Costs $10,000, Move Out Costs $140,000, Security Costs $5,000, Investigative Costs $5,000, etc.

The court afforded DLC and Alderman the opportunity to challenge these allocations. They responded by submitting a declaration, trial exhibits, charts and information prepared by experts. The court approved allocations and credits after considering the evidence and the nonsettling defendants' objections. The trial judge was in the best position to calculate the credits because he was the trier of fact at trial and presided over all the settlement allocation proceedings. Appellants have not shown error from the record why the trial court could not draw reasonable inferences to support the allocations it made. (*Wilson v. John Crane, Inc.*, *supra*, 81 Cal.App.4th at p. 866.)

Appellants claim the court erred by using trial evidence to adjust settlement allocations. But the court has "wide discretion" over the procedure. (*Regan Roofing Co. v. Superior Court*, *supra*, 21 Cal.App.4th at p. 1701.) Moreover, the court held additional hearings at appellants' invitation. They requested the trial court to change the settlement allocations because of subsequent trial testimony which was favorable to them. The court at their request modified the allocations on toxic mold.

DLC and Alderman claim that the credits were inadequate and arbitrary. We disagree. The credits they received were related to the damages they caused. Their work caused damage to walls and forced Escorial to incur several categories of consequential costs. To reduce their liability, the court gave them credits from the exterior wall assemblies and consequential costs settlement categories. The settlement allocation for Exterior Wall Assemblies came from five settling contractors and totaled $1,066,340. DLC and Alderman received credit for that entire amount. They also received credits for the entire settlement amounts allocated to the five categories of consequential damages. They have not shown that these allocations or credits were unreasonable.

They claim they were unfairly denied credits for the remaining settlement allocations. They did not receive credit for the $432,521 in the category of "Roofing." But the court could find that area was distinct from their work. Other categories involved allocations for repair costs for categories unrelated to DLC's and Alderman's work and performed by contractors in other trades, e.g., Doors and Windows $78,759, Plumbing $476,999, Tubs and Showers $193,134, Decking $230,648, Electrical $57,600, Paving $52,800, etc.

Moreover, DLC and Alderman caused the largest amount of structural damage. Their combined liability of $8.6 million was $3.6 million more than the combined damages allocated for all the settling subcontractors. But the court's credits substantially reduced DLC's and Alderman's combined liabilities to $2,461,495. They received credits for most of the $10.62 million settlement. Their credits were proportional to the work they did. They have failed to show an abuse of discretion.

## COASTLINE'S, MID-CAL'S, AND PYRAMID'S APPEALS

### I. *Attorney Fees*

Coastline, Mid-Cal, and Pyramid contend the trial court erred by reducing their attorney fees by apportioning the time spent between contract and tort claims.[3] We disagree. The amount of attorney fees is within the sound discretion of the trial court. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 [95 Cal.Rptr.2d 198, 997 P.2d 511].) Appellants claim a fee provision in the indemnity contract supports fees for contract and tort issues and the court erred by awarding fees only for contract issues. The provision states: "[I]n any action or proceeding brought to *construe or enforce the terms of this Subcontract*, . . . the prevailing party shall be entitled to . . . reasonable attorneys' fees . . . ." (Italics added.)

 Fees may be awarded for noncontractual issues where the fee provision is broad enough to cover those claims. (*Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1344 [5 Cal.Rptr.2d 154].) Here the provision limits fees to actions to enforce the terms of the subcontract. The court reasonably interpreted this narrow provision to apply only to contract issues. (*Hasler v. Howard* (2004) 120 Cal.App.4th 1023, 1027 [16 Cal.Rptr.3d 217].) It decided to separate the attorney time spent on contract and tort claims.

Appellants claim it erred by apportioning fees as the issues were interrelated. But where "joinder of a noncontractual cause of action to a contractual cause of action entitles the prevailing party to no more than the fees incurred on the contract . . . the trial court should apportion the fees. [Citation.]" (*Shadoan v. World Savings & Loan Assn.* (1990) 219 Cal.App.3d 97, 108 [268 Cal.Rptr. 207].) The apportionment is within the trial court's discretion. (*Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1111 [51 Cal.Rptr.2d 286].) A court may apportion fees even where the issues are connected, related or intertwined. (*Shadoan, supra,* at p. 109; see also *Heppler v. J.M. Peters Co., supra,* 73 Cal.App.4th at p. 1297.)

Here the court found that tort and toxic mold issues were severable from the indemnity issues. It rejected appellants' claim that the issues were "so intertwined" that it could not isolate the time spent on each issue. It said, "if this case had been tried on the express indemnity issues only, the trial would have been much shorter, much less complex, with significantly fewer

---

[3] Hereafter and continuing through the end of this opinion, the term "appellants" will refer to Coastline, Mid-Cal, and Pyramid.

costs . . . ." These factors supported the court's decision to apportion fees. (*Heppler v. J.M. Peters Co.*, *supra*, 73 Cal.App.4th at p. 1297.) Appellants have not shown that the hours spent for the various issues were not divisible or that the apportionment was unreasonable.

But even if the court erred, the result does not change. Escorial filed objections to the fee motion on other grounds including: (1) the hours were not adequately documented, (2) hourly rates were too high, (3) there was no adequate system to track the time for multiple defendants, (4) counsel overbilled 110 hours for depositions, and (5) they billed for work unrelated to the case. It attached depositions by appellants' counsel to impeach portions of the attorney fee motion. The trial court stated that to award the full amount of fees appellants requested "would result in the levy of penalties disguised as attorney fees . . . ." From Escorial's objections, it could question the accuracy of the claim for fees and reasonably infer that many of the hours requested were inadequately documented or overbilled.

Appellants claim that the reduction in fees was "drastic" and they were awarded an inadequate total fee of $400,000. But "[t]he only proper basis for reversal of a fee award is an award so . . . small that it shocks the conscience . . . ." (*Track Mortgage Group, Inc. v. Crusader Ins. Co.* (2002) 98 Cal.App.4th 857, 868 [120 Cal.Rptr.2d 228].) That is not the case here. The award was not insubstantial and appellants are not automatically entitled to all hours they claim in their request for fees. They must prove the hours they sought were reasonable and necessary. (*Levy v. Toyota Motor Sales, U.S.A., Inc.* (1992) 4 Cal.App.4th 807, 816 [5 Cal.Rptr.2d 770].)

Here they did not meet that burden. The Hardin & Coffin law firm sought compensation for 4,765 hours of attorney time and $333,225 for 2,222 hours of "paralegal time." But the declaration attached to the motion did not categorize the hours, describe the services or state facts showing why they were necessary and reasonable. Nor did it explain why the firm needed such an enormous amount of nonattorney services.

The trial court noted that two law firms represented Mid-Cal. It found this amounted to a "considerable overlap and therefore there is considerable reduction in the fees awarded to each." Two law firms had also represented Coastline for a substantial period. A court may substantially reduce fees

where multiple counsel represent a party leading to a duplication of effort. (*California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730, 753–754 [246 Cal.Rptr. 285].)

The trial court also found that the hourly rates counsel sought were twice the amount they billed the insurance company. Moreover, from its vantage point of presiding over a trial, which lasted several months, the court was in the best position to determine the amount of hours reasonably necessary for this case. Appellants have not shown that reducing the fees was an abuse of discretion. (*Meister v. Regents of University of California* (1998) 67 Cal.App.4th 437, 452, 455–456 [78 Cal.Rptr.2d 913]; *Levy v. Toyota Motor Sales, U.S.A., Inc.*, *supra*, 4 Cal.App.4th at p. 816.) Our decision to uphold the trial court is not a reflection on the competence or integrity of counsel.

## II. *Other Issues*

Coastline, Mid-Cal and Pyramid challenge trial court rulings which rejected various defense issues. But because they prevailed on other grounds, these issues are moot. (*People v. West Coast Shows, Inc.* (1970) 10 Cal.App.3d 462, 467 [89 Cal.Rptr. 290].)

### *Escorial's Request for Judicial Notice and Motion to Dismiss Appeal*

Escorial has filed a request for judicial notice of a California Secretary of State's certificate. We have taken judicial notice of this document, which certifies that Coastline's corporate status was suspended in January of 2005 for its failure to pay taxes while this case was on appeal. Escorial has also filed a motion to dismiss Coastline's appeal and strike its appellate briefs based on its suspended corporate status. (Rev. & Tax. Code, § 19719, subd. (a).)

Coastline was in good standing at the time it obtained its award of fees and when it filed its appeal from that order. Randy Taylor, Coastline's president, has filed a declaration in which he states that he has paid all the back taxes. We have also granted Coastline's request to take judicial notice of documents which show that it is now in good standing and its corporate status has been revived. Escorial's motion to dismiss is denied. (*Peacock Hill Assn. v. Peacock Lagoon Constr. Co.*, *supra*, 8 Cal.3d at p. 373.)

We have reviewed the parties remaining contentions and conclude they have not shown reversible error.

The judgment is affirmed. Each party shall bear its own costs on appeal.

Yegan, J., and Perren, J., concurred.

A petition for a rehearing was denied October 3, 2007, and the opinion was modified to read as printed above. The petition of plaintiffs and appellants for review by the Supreme Court was denied December 19, 2007, S157250.