Filed 3/4/13  Charles Virzi Construction v. Studer CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CHARLES VIRZI CONSTRUCTION, INC., <br><br> Plaintiff, Cross-defendant and Appellant, <br><br> v. <br><br> G. KEVIN STUDER et al., <br><br> Defendants, Cross-complainants and Respondents; <br><br> CHARLES VIRZI, <br><br> Cross-defendant and Appellant. | G044326 <br> (consol. w/ G045498) <br><br> (Super. Ct. No. 07CC02257) <br><br> O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Richard Luesebrink, Retired Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed as modified.

David B. Dimitruk for Plaintiff, Cross-defendants and Appellants.

Keathley & Keathley, H. James Keathley and Katherine D. Keathley for Defendants, Cross-complainants and Respondents.

* * *

Plaintiff Charles Virzi Construction, Inc., and cross-defendant Charles Virzi appeal from a judgment for defendants G. Kevin Studer and Wells Fargo Bank.[1] Virzi's briefs and the record on appeal are voluminous, but fundamentally inadequate. Nonetheless, we find in the record ample support for the judgment for Studer on Virzi's complaint and Studer's cross-complaint. In short, substantial evidence demonstrates Virzi breached its contract with Studer and acted negligently by deficiently remodeling Studer's home. We modify the judgment to correct an inexplicable surplus in Studer's attorney fee award, and affirm.

## FACTS

*Studer Hires Virzi to Remodel His House*

Charles is a licensed general contractor and the owner of Virzi, which itself holds a general contracting license. Studer had been personal friends with Charles since about 1995.

In 2003, Studer asked Charles to look at a San Clemente house that Studer was thinking about buying. They discussed whether it could be "cost effectively remodeled," including adding a second story. Studer bought the house. Charles recommended a draftsman to draw plans, and reviewed the plans and suggested revisions.

---

[1] "Virzi" refers to plaintiff and collectively to cross-defendants. When necessary for clarification, "Charles" will refer to Charles Virzi as an individual.

Studer hired Virzi to remodel the house in 2005. Charles "proposed the idea of doing a cost plus contract very early in [the] design and planning activities. [Studer] told [Charles] that [he] was absolutely not interested in pursuing that kind of a construction relationship with him. [Studer] felt that that was far too open-ended and far too much risk. And [so Studer] stated [he] would only go forward on the basis of a for-fixed-price contract."

Charles gave Studer a copy of Virzi's standard form contract, leaving the price blank. Studer prepared a budget spreadsheet reflecting a fixed price of $431,420, which included a 10 percent contractor's margin (exhibit 26). Virzi wanted a 15 percent margin instead. Eventually, Studer and Virzi orally agreed to a contractor's margin of 12 percent. But Studer "inadvertently did not update the spreadsheet for 12 percent prior to sending it to Wells Fargo."

Studer called Virzi on May 13, 2005, to ask Charles to sign the contract so Studer could submit it to Wells Fargo Bank (Wells Fargo). Studer and Charles agreed Studer would use the "number . . . that was on the budget spreadsheet" to fill in the contract price. Charles instructed Studer "to sign on his behalf" because Charles "was not anywhere close to the local area." Studer filled out the contract with the $431,420 fixed price, signing his name and Charles's name to it (exhibit 28.) He faxed the signed contract to Wells Fargo (exhibit 29).

Virzi delivered two additional form contracts to Studer in June 2005. Virzi wanted a single written contract to encompass the originally budgeted work plus a change order for approximately $150,000 in additional structural work required by the City of San Clemente (City). Studer signed the blank form contracts after Charles told him he would correct typographical errors and estimate the amount of the change order. Charles signed the two contracts, dated one June 10, 2005, and returned it to Studer with the contract price still blank (exhibit 39).

Charles kept the other signed contract. He dated that one June 11, 2005, and filled out the contract price as "cost plus 12 percent" (exhibit 50). He never gave a copy of that contract to Studer — not until Virzi filed a mechanic's lien in December 2006.

Charles sent a letter to Studer on September 8, 2005. The letter stated, "I've had many conversations with you about our budget. You said we have only $489,000 or close to this amount." Studer wrote a letter in response, noting the "project budget" was "$431,420 with a 10 percent contingency, for a grand total of $474,562" — "This is consistent with your bid based on the plans that you had provided for your bidding purposes." Virzi did not respond to this letter.

*The Trial*

Virzi sued Studer and Wells Fargo in 2007. It asserted causes of action including breach of contract, conversion, foreclosure of mechanic's lien, and declaratory relief. Virzi alleged Studer requested extra work above and beyond the contract, but failed to pay for it. It attached a copy of the June 11, 2005 contract to its verified complaint.

Studer filed a cross-complaint against Virzi and Charles. He asserted causes of action for breach of contract, fraud, negligence, and common counts. He alleged Virzi "failed to complete the work in the time agreed in the contract" and "undertook work without [Studer's] request and without authorization through contractually-required change orders." He further alleged Virzi negligently performed the work, requiring total demolition.

At trial, Virzi called Charles to testify about the contract. He claimed there was "never" any "agreement or discussion of a fixed [price] contract. It was always going to be a cost plus. We were — our normal fee is cost plus 15 percent. Mr. Studer really didn't want to pay that much. And [Charles] agreed to do it for cost plus 12

4

percent." Charles conceded the "cost plus 12 percent" provision was not contained in the June 10, 2005 version, even though "it was already agreed to before then"; he first "put in cost plus 12 percent" in the June 11, 2005 version.[2]

Virzi also called Charles, an expert general contractor, and several subcontractors to testify about the work on the house. In general, they opined the work met the standard of care and complied with code — and any work violating code was either excused by the building inspector on site (Hardesty), or requested or accepted by Studer. The expert conceded the house needed some repairs, like fixing the leaky roof. And the expert did not "conduct any electrical investigation [him]self on the property." Virzi did not call Hardesty.

Studer testified to his account of the contract formation. He stated the parties agreed to a fixed price of $431,420, and that Charles authorized him to sign the May 2005 contract for Virzi. Ultimately, he paid Virzi just over $556,000 for its work.

Studer also called an expert general contractor, an expert electrician, and the City's senior building inspector. The expert general contractor (Christakes) testified the house as built contained "numerous" unpermitted deviations from the permitted plans and did not reflect $560,000 worth of work. The senior building inspector (Tullius) testified there were "some code violations there that should have been taken care of prior to the final" permit approval. Tullius explained Hardesty should not have issued the final permit due to "code-related items." Any deviations in construction from the City-

---

[2]     Virzi's counsel told the court "we get to the same end point whether you conclude it's contract A or B" — in other words, Virzi's contract damages were the same whether the contract was for a fixed price of $431,420 (plus $150,000 for the additional structural work), or whether it was for cost plus 12 percent. Either way, Virzi sought to recover about $87,000 from Studer. Virzi's counsel conceded the contract formation issue "doesn't have relevance to the damages," but offered it may have "relevance as to credibility."

approved plans should have gone "back into plan check, and they [had] to be approved for what's in the field, drawn up by the architect and approved by the engineer."

Here is just some of Studer's expert testimony on specific contract deviations and code violations. The experts testified to other shortcomings, too. And the court saw the house in person when it conducted a site visit.

*Electrical.* Studer's expert electrician (Griffith) testified "the design and installation on this project were subpar," with numerous code violations. At least 50 electrical connections had wires "just . . . twisted together," without the required mechanical connectors. There were open light fixtures over the bathtubs. The distance between receptacles violated code, and ordinary receptacles were installed where the code required ground fault circuit interrupter receptacles. None of the smoke detectors had power because grounded and ungrounded conductors on that circuit had come into contact, causing a short. A forced air unit was not on a dedicated circuit. The wall ovens and cook tops were on a 30 amp circuit instead of a 40 amp circuit. Junction boxes, a hot tub motor, and the air conditioning compressor disconnects were inaccessible.

The house also contained many fire hazards. These included an overloaded junction box, exposed wiring within junction boxes, multiple grounded conductors connected to a single screw in the electrical panel, and junction boxes without covers.

The expert electrician concluded the electrical work at the house fell below the standard of care "[b]ecause for an installation to be acceptable it needs to meet all of the code requirements. And this property does not." A building inspector "cannot approve a code violation."

*Deck.* The deck was "loaded with thousands of pounds of additional weight in lathing, concrete and tile" — "somewhere in the neighborhood of 12- to 15,000 pounds" — that "impacted the engineering of the property." And the deck "leak[ed] into the family room." A fireplace on the deck was "a fire hazard" and had already "burned the paint off the cowl."

6

*Roof.*  The roof was "a disaster" — "no part of the roof" was "salvageable." It was "framed poorly," and "with the wrong pitch."  The "miserable framing" included misplaced or twisted rafters, broken frieze blocks, and "really, really poor work on the fascia."  Eleven dormers were missing, leading to inadequate ventilation.  The roof tiles were a cheap substitute for the ones called out on the plans, and they were "not installed according to the manufacturer's installation."  The installation was "hideous," "just very sloppy roofing."  The expert concluded the roof's "workmanship is atrocious, and not acceptable by any custom and practice in the construction industry."

*Forced air units.*  The furnaces were placed "in new locations, not [as] depicted on the plans."  Moreover, "the new locations don't comply with code" because they do not allow for proper air circulation.

*Master bedroom and bath.*  One "entire wall" of the master bedroom "need[ed] to be reframed," and doors needed to be refinished and rehung.  The entire master bathroom "just has to start over."  Its exterior wall needed to be "rework[ed]" because it was "not framed to plan," the hot tub needed to be reinstalled, the stone needed to be reinstalled, and "there's no glass block that was bid into the project."

*Wrought iron.*  The ornamental wrought iron on an internal spiral staircase and the balcony "is going to have to come out," to be "re-sprayed and re-installed."  The stairs' radius does not comply with code.

*Kitchen.*  The kitchen sink lacked an air gap.  That is "the little device by your faucet that looks — that's about, oh, an inch in diameter, two inches high," that prevents sewage water from backing up into the dishwasher.

*The Judgment*

The court issued a 17-page statement of decision, finding for Studer on Virzi's complaint and Studer's cross-complaint.  It "found [Studer] to generally be an accurate historian who was credible and [Charles] to be a not very credible witness . . . ."

7

It noted Charles "took positions and either omitted or committed acts and conduct that one would never expect from an experienced contractor and builder." It further noted Charles "had the misfortune of being convicted of felony interstate sales of drugs which is a factor in weighing credibility . . . ."

On the contract formation issue, the court "accept[ed] the testimony of [Studer] and reject[ed] the testimony and [Charles] and conclude[d] Exhibits 28 and 29 were the agreement between the parties, contrary to [Virzi's] claim that the contract was forged by [Studer] without [Virzi's] knowledge or consent." It found "$431,420 plus a 10% contingency plus an additional loan of $150,000 by [Wells Fargo] or a total of $624,544 was available against the Agreement which provided for labor and materials and a 12% built-in factor not to exceed $431,420 plus a 10% contingency was the projected money available for the project."

As to the work itself, the court credited Studer's expert, who "spent approximately 85 hours on the case" and whose testimony was "very meticulous and detailed." Virzi's expert, in contrast, was "well-qualified" but "spent 2 hours on his inspection and 1 hour taking photos."

The court generally found "as construction progressed, many undocumented changes in the plans were taking place and sub-standard work by [Charles] and [Virzi] became more and more apparent." It found "there were scores of variances and changes from the City's approved building plans too numerous to recite . . . ."

The court found Studer was entitled to recover just over $150,000 in compensatory damages, either in contract or tort. It awarded the following damages (amount rounded to nearest thousand): (1) electrical — $51,000 "necessary in order to remedy deficiencies in the electrical system"; (2) "view deck, fireplace and drainage" — $30,000; (3) roof — $23,000 "for the very sub-standard construction of the roof and failure to install pursuant to plans"; (4) forced air units — $19,000; (5) roof leak —

8

$9,000; (6) plans — $9,000 "as a result of the need to have new plans and specifications prepared in order to effectuate the remedial work necessary to be done as a result of sub-standard performance by [Virzi] and [Charles]"; (7) master bedroom and bath — $5,000 "as a result of sub-standard construction"; (8) wrought iron — $5,000 "as a result of fabrication errors in the wrought iron railing"; (9) kitchen — $1,000 "to install an air gap in the sink." It declined to award damages for Studer's claims regarding framing, stucco, mold, interior stairs/marble, kitchen countertops and backsplashes, hardwood floors, and loss of use of property.

The court awarded further recovery to Studer. First, it awarded "costs as damages under the authority of *Stearman v. Centrex Homes* (2000) 78 Cal.App.4th 611, in an amount to be determined by motion therefor." Next, it awarded "prejudgment interest in an amount according to law." Finally, it awarded "costs of suit, including reasonable attorneys' fees pursuant to a post-judgment motion." The court signed a "JUDGMENT" on August 2010.

Studer filed the contemplated posttrial motions. The court granted his motion to recover his investigative and repair costs, i.e., his *Stearman* costs. (See *Stearman v. Centrex Homes supra*, 78 Cal.App.4th at pp. 624-625 (*Stearman*).) It awarded almost $35,000 in *Stearman* costs to Studer. Next, the court granted two motions by Studer to recover his attorney fees, awarding over $330,000 to Studer.

The court entered an "AMENDED JUDGMENT" for Studer in May 2011. The amended judgment included the compensatory damages, *Stearman* costs, attorney fees, as well as over $16,000 in statutory costs and more than $30,000 in prejudgment interest. The total judgment for Studer and against Virzi and Charles, jointly and severally, was for $566,210.85.

9

DISCUSSION

*Virzi Makes Four Major Missteps in Its Appeal*

Early on, we granted Virzi's request to file an oversized opening brief. In hindsight, that may have been improvident.

Virzi filed a 138-page opening brief containing more than 44,000 words. The table of contents identified 64 separately numbered issues, sub-issues, sub-sub-issues, and sub-sub-sub-issues. Virzi assured us this exacting detail was required by the "number of novel issues" here. Virzi claimed each of "the approximate[ly] 50 separate categories and subcategories of damages . . . involves different facts and different laws," and that there were "multiple reasons why the trial court erred as to every category and subcategory of damages it awarded, save one category." Virzi followed up with a reply brief that used each and every one of the 28,000 words allowed by rule.

Despite the briefs' length, Virzi's case suffers from two glaring omissions and two fundamental misconceptions. Any of these flaws dooms its appeal.

The first omission is this: there is no concise statement of facts supporting the judgment. Virzi's 138-page opening brief dedicates about five full pages to a statement of facts. They refer to some evidence supporting the court's findings on contract formation. But there is no reference to any evidence supporting the court's findings on breach, negligence, or damages. Reading only those pages, one would conclude Virzi built the perfect home. Any references to Studer's contrary evidence are scattered about the other 133 pages.

This is woefully inadequate. "'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' [Citations.] [Virzi's] contention herein 'requires [it] to demonstrate that there is *no* substantial evidence to support the challenged findings.' (Italics added.) [Citations.] A recitation of only [Virzi's] evidence is not the 'demonstration' contemplated under the

10

above rule." (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) "[A]n attack on the evidence without a fair statement of the evidence is entitled to no consideration when it is apparent that a substantial amount of evidence was received on behalf of the respondent. [Citation.] Thus, appellants who challenge the decision of the trial court based upon the absence of substantial evidence to support it '"are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed waived."'" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)

The second omission is this: Virzi did not transmit the trial exhibits to this court, though it relies heavily on them. For example, it claims exhibit 46, the construction loan agreement, "contains a number of statements . . . that precluded the trial court from reaching certain determinations . . . ." One sentence in the opening brief describing the construction work is followed by a citation to 28 exhibits. And another sentence cites to 28 different exhibits. There were six binders of trial exhibits containing "in excess of 4,000 pages," according to Virzi's request to file an oversized brief. But Virzi did not transmit these binders. So we do not have, for instance, the photographs taken by Studer's expert general contractor or his repair estimate.[3]

"We presume the evidence supports every finding of fact unless [the] appellant demonstrates otherwise . . . ." (*El Escorial Owners' Assn. v. DLC Plastering, Inc*. (2007) 154 Cal.App.4th 1337, 1357 (*El Escorial*).) Thus, a party relying on trial exhibits must arrange to have them transmitted to the appellate court. (See Cal. Rules of

---

[3] Virzi did attach two exhibits comprising three pages to its opening brief. Some other exhibits happen to fall here and there in the appellant's appendix, usually as attachments to one motion or another. But when Virzi cites to exhibits in its briefs it does so by exhibit number, not appendix page, rendering those exhibits unhelpful. "Counsel is obligated to refer us to the portions of the record supporting his or her contentions on appeal." (*Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1149.) "[W]e will not scour the [1,500 page appendix] on our own in search of supporting evidence." (*Ibid*.)

11

Court, rule 8.224(a)(1), (b)(1).)  The failure to do so may doom an appeal.  "'While certain contentions based upon these exhibits are made in appellant's briefs, it may be assumed that he has abandoned these contentions since he has not desired to arrange to have these exhibits sent here as a part of the record.'"  (*Brown v. Copp* (1951) 105 Cal.App.2d 1, 9.)  At the very least, "[w]here exhibits are missing we will not presume they would undermine the judgment."  (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 291.)

Turning to the two misconceptions, the first is this:  Virzi improperly seeks to retry the case on appeal.  Virzi goes to great lengths to convince us that Studer testified inconsistently or unbelievably, and that his experts were just plain wrong.  "These are not issues we rework on appeal.  Appellate courts 'do not reweigh evidence or reassess the credibility of witnesses.  [Citation.]'  [Citation.]  Put another way, '[t]he Court of Appeal is not a second trier of fact . . . .'"  (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531.)  "It was the function of the trial court, not this court, to resolve inconsistencies and contradictions, if any, in the testimony of these witnesses.  The trier of fact may believe and accept a portion of the testimony of a witness and disbelieve the remainder.  On appeal that portion which supports the judgment must be accepted, not that portion which would defeat, or tend to defeat, the judgment."  (*Sidney v. Martin Iron Works* (1951) 105 Cal.App.2d 295, 298; accord *In re Frederick G.* (1979) 96 Cal.App.3d 353, 366.)  And "we must draw all reasonable inferences from the record to support the judgment."  (*El Escorial*, *supra*, 154 Cal.App.4th at p. 1357.)  The court accepted Studer's account of how the contract was negotiated and executed.  It credited Studer and his experts.  It did its own site visit.  Simply put, the court just did not believe Charles or Virzi's witnesses.

The second misconception is this:  Virzi repeatedly flyspecks the statement of decision instead of analyzing the record.  The attack is misguided.  "A statement of decision may be wrong, but the judgment must be affirmed "'if it is correct on any

12

theory . . . ."'"'" (*El Escorial*, *supra*, 154 Cal.App.4th at p. 1352.) "'"[A]n appellate court reviews the action of the lower court and not the reasons given for its action; and . . . there can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct. "The fact that the action of the court may have been based upon an erroneous theory of the case, or upon an improper or unsound course of reasoning, cannot determine the question of its propriety. . . ."'"'" (*Id.* at pp. 1352-1353.)

And a threshold matter, Virzi's 22-page written request for a statement of decision was ineffective. It improperly sought "an inquisition, a rehearing of the evidence" by asking for findings on 86 separately numbered issues.[4] (*People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 525, abrogated on other grounds in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 184-185.) "Such a detailed evidentiary analysis is not required by law." (*Casa Blanca Convalescent Homes, Inc.*, at p. 524; accord *Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1379-1380 [court was "not required to respond point by point" to 36 requested issues].)

Even if Virzi's request were proper, the statement of decision was adequate. "The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case." (*Golden Eagle Ins. Co. v. Foremost Ins. Co.*, *supra*, 20 Cal.App.4th at p. 1380.) "[A] trial court rendering a statement of decision under Code of Civil Procedure section 632 is required to state only ultimate rather than evidentiary facts because findings of ultimate facts necessarily

---

[4] For example, "ISSUE NO. 31" was "Whether the last requisition pursuant to paragraph 3.d of the two written Residential Construction Loan Agreements (see Exhibits 46 and 458) submitted by Mr. Studer to Wells Fargo Bank was on July 5, 2006 (Exhibit 261) or July 18, 2006 (Exhibit 272), depending on whether the July 18, 2006 letter is treated as a requisition." And "ISSUE No. 71" was "As to the category of damages tentatively awarded as damages by the court in its Notice of Tentative Decision for the electrical system, whether any evidence was introduced at trial demonstrating that the electrical system must be replaced and if so, the identity of that evidence."

13

include findings on all intermediate evidentiary facts necessary to sustain them." (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 599.) The statement of decision sufficiently disclosed ultimate findings that Virzi breached the contract and acted negligently, causing the specified damages, and that Studer did not breach the contract.

Any one of these four fatal flaws could warrant rejecting Virzi's claims at the outset. Without excusing these missteps, we will address Virzi's contentions.

*Sufficient Evidence Supports the Judgment Against Virzi on Its Complaint*

Virzi raises two main issues in defense of its claims against Studer. First, it asserts the court wrongly accepted Studer's version of the contract. Second, it insists it substantially performed its contractual duties, with its many code violations excused. Neither claim is compelling.

First, Virzi contends the court wrongly found the parties entered into the May 2005 contract. Virzi denies agreeing to it. It asserts Studer conceded Virzi never accepted the 10 percent markup that was incorporated into the $431,420 fixed price. It further asserts Studer wrongly signed Charles's name to the contract, rendering the contract an illegal forgery and a fraud on Wells Fargo.[5] And Virzi denies Studer agreed to the May 2005 contract. It asserts Studer conceded he intended to pay a 12 percent markup to Virzi, not 10 percent. And Studer acknowledged he knew when he signed the contract that the price would change to accommodate the City's extra work.

The simple response is that the court believed Studer. To be sure, Studer testified he and Charles were negotiating the amount of Virzi's markup, and Charles never expressly told him Virzi would accept 12 percent, let alone 10 percent. But Studer

---

[5] Virzi wrongly presumed it was deputized to protect Wells Fargo's interests in a prior appeal, when it tried to disqualify Studer's counsel due to purported conflicts of interests between Studer and Wells Fargo. (*Charles Virzi Const., Inc. v. Studer* (Dec. 23, 2010, G042259) [nonpub. opn.].)

14

also testified Charles ultimately agreed that Studer could sign the May 2005 contract on Virzi's behalf, using the budget price of $431,420 — which was based on a 10 percent markup. That objectively manifested Virzi's intent to accept 10 percent. And Studer's private intention to pay 12 percent to Virzi is immaterial. "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement . . . ." (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912.) Mutual consent "is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141, disapproved on another ground in *Reid v. Google, Inc*. (2010) 50 Cal.4th 512, 524.) And the contract, from what we can tell, contained a provision governing change orders for additional work. It was sufficiently definite to be enforced.

For all its bluster on contract formation, Virzi fails to show the contract dispute has any real significance. It conceded at trial its claimed contract damages are the same under a fixed price contract and a cost plus 12 percent contract. Even more oddly, Virzi now disclaims any interest in showing the parties agreed to the June 11, 2005 contract that underlies its claim. It refrains from doing so "since the trial court's selection of Trial Exhibit 28 [the May 2005 contract] over Trial Exhibit 50 [the June 11, 2005 contract] was based in part on the trial court's exercise of its prerogative to decide certain issues of fact one way or the other." Instead, Virzi asserts that on retrial "the next trial judge should make the determination of 'what constitutes the contract' without, however, Trial Exhibit 28 being one of the choices . . . ." What other contract would Virzi have the court choose, if not the June 11, 2005 version? Its confusing stance aside, Virzi still fails to show what difference it would make to its contract cause of action if the court accepted some contract other than the May 2005 contract. Even if the court erred by enforcing the

15

May 2005 contract instead of the June 11, 2005 contract, Virzi fails to show any resulting prejudice. (See Cal. Const., art. VI, § 13.)

Second — and apparently now relying on the May 2005 contract, but maybe not — Virzi contends the court wrongly rejected its breach of contract claim. Virzi asserts it substantially performed the contract, and building inspector Hardesty had discretion to excuse its deviations from the building code. (See Health & Saf. Code, § 17951 (section 17951).)

But "'[w]hat constitutes substantial performance is a question of fact" (*Murray's Iron Works, Inc. v. Boyce* (2008) 158 Cal.App.4th 1279, 1291), which we review for substantial evidence (*id*. at p. 1292). For the doctrine to apply, "'it is essential that there be no wilful departure from the terms of the contract, and that the defects be such as may be easily remedied or compensated, so that the promisee may get practically what the contract calls for.'" (*Id*. at p. 1291.) Thus, courts have applied it when the contractor successfully completes virtually all of the work. (See, e.g., *Lowy v. United Pacific Ins. Co.* (1967) 67 Cal.2d 87, 92-93 [failure to perform only $1,470 worth of work on $73,500 contract]; *Thomas Haverty Co. v. Jones* (1921) 185 Cal. 285, 291-292 [approximately $2,200 error on $27,000 contract].) In contrast, courts still "den[y] contractors the right to recover pursuant to the doctrine of substantial performance where their performance was not found to meet a reasonable standard." (*Murray's Iron Works*, at p. 1292.) Here, the record abundantly shows Virzi's work was so egregiously deficient in so many ways that the court could reasonably find no substantial performance.

And code compliance is a red herring. Neither the contract nor the standard of care allowed Virzi to do no more than meet code. The contract, as far as the record discloses, required Virzi both to comply with the plans and "perform and complete the Work in a good and workmanlike manner." And "'"'[a]ccompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done . . . .'"'" (*El Escorial*, *supra*, 154 Cal.App.4th at p. 1358.)

16

"Contractors must use reasonable skill and judgment" to comply with the standard of care. (*Id.* at p. 1357.) Again, the record contains ample evidence Virzi's work deviated from the plans, was neither good nor workmanlike, and reflected a lack of care and skill.

Moreover, building inspector approval does "not insulate contractors from liability for defective work." (*El Escorial*, *supra*, 154 Cal.App.4th at p. 1358 [inspector approval "does not change the result" when contractor held negligent because work "fell below the due care standard"].) Virzi relies heavily on section 17951, which addresses only the ability of localities to enforce the building code.[6] The statute does not speak to a

---

[6] Here is the statute's text. "(a) The governing body of any county or city, including a charter city, may prescribe fees for permits, certificates, or other forms or documents required or authorized by this part or rules and regulations adopted pursuant to this part. [¶] (b) The governing body of any county or city, including a charter city, or fire protection district, may prescribe fees to defray the costs of enforcement required by this part to be carried out by local enforcement agencies. [¶] (c) The amount of the fees prescribed pursuant to subdivisions (a) and (b) shall not exceed the amount reasonably required to administer or process these permits, certificates, or other forms or documents, or to defray the costs of enforcement required by this part to be carried out by local enforcement agencies, and shall not be levied for general revenue purposes. The fees shall be imposed pursuant to Section 66016 of the Government Code. [¶] (d) If the local enforcement agency fails to conduct an inspection of permitted work for which permit fees have been charged pursuant to this section within 60 days of receiving notice of the completion of the permitted work, the permittee shall be entitled to reimbursement of the permit fees. The local enforcement agency shall disclose in clear language on each permit or on a document that accompanies the permit that the permittee may be entitled to reimbursement of permit fees pursuant to this subdivision. [¶] (e)(1) The provisions of this part are not intended to prevent the use of any manufactured home, mobilehome, multiunit manufactured home, material, appliance, installation, device, arrangement, or method of construction not specifically prescribed by the California Building Standards Code or this part, provided that this alternate has been approved by the building department. [¶] (2) The building department of any city or county may approve an alternate material, appliance, installation, device, arrangement, method, or work on a case-by-case basis if it finds that the proposed design is satisfactory and that each such material, appliance, installation, device, arrangement, method, or work offered is, for the purpose intended, at least the equivalent of that prescribed in the California Building Standards Code or this part in performance, safety, and for the protection of life and health. [¶] (3) The building department of any city or county shall require evidence that any material, appliance, installation, device, arrangement, or method of construction

17

contractor's standard of care, and says nothing about contractual duties. Virzi cites no case applying the statute to subvert the longstanding rule that negligent contractors cannot "exculpate themselves from liability as a matter of law merely by . . . relying upon the approval of the building inspector." (*Firemen's Ins. Co. v. Indermill* (1960) 182 Cal.App.2d 339, 343.)

Finally, Virzi's other contentions assume its own adequate performance. Virzi complains the court imposed a punitive forfeiture by finding against it. It asserts on appeal "the uncontradicted evidence showed that Mr. Studer breached that contract and underpaid [it] by the sum of $156,997.07" — almost twice what it sought at trial. But substantial evidence shows Virzi failed to substantially perform its own contractual duties, excusing Studer's performance. "When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract." (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277.) At any rate, the record shows Virzi received over $550,000 from Studer, more than three times the $150,000 in compensatory damages awarded to Studer. We see nothing unfairly punitive about that.

*Sufficient Evidence Supports the Judgment Against Virzi on the Cross-complaint*

By our count, Virzi raises five main challenges to Studer's judgment on his cross-complaint. Virzi asserts (1) Studer's tort damages are precluded by contract, (2) Studer's evidence was insufficient to support the judgment, (3) Charles cannot be held

conforms to, or that the proposed alternate is at least equivalent to, the requirements of this part, building standards published in the California Building Standards Code, or the other rules and regulations promulgated pursuant to this part and in order to substantiate claims for alternates, the building department of any city or county may require tests as proof of compliance to be made at the expense of the owner or the owner's agent by an approved testing agency selected by the owner or the owner's agent." (§ 17951 et seq.)

individually liable, (4) Studer may not recover his *Stearman* costs; and (5) prejudgment interest could not be recovered.  Each claim lacks merit.

First, Virzi wrongly contends Studer could not recover tort damages because the parties' relationship was governed by contract.  To be sure, "[a] person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations."  (*Aas v. Superior Court* (2000) 24 Cal.4th 627, 643.)  But "[a] contractual obligation may create a legal duty the breach of which will support a tort action."  (*Michaelis v. Benavides* (1998) 61 Cal.App.4th 681, 687.)  "''''Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort as well as a breach of the contract.'''''"  (*El Escorial*, *supra*, 154 Cal.App.4th at p. 1358.)  "A contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner.  A negligent failure to do so may be both a breach of contract and a tort.  [Citation.]  In such a hybrid circumstance, the plaintiff is entitled to pursue both legal theories until an occasion for an election of remedies arises."  (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 774.)

Here, Studer has no reason to elect a remedy because he obtained no double recovery.  The court found Virzi liable for breach of contract and negligence, but it properly awarded only one single set of compensatory damages.  Those damages are not duplicative just because they are warranted by two different theories.

Second, the judgment against Virzi is amply supported by the record. Studer, his experts, and the City's senior building inspector testified to dozens of code violations, plan deviations, and workmanship deficiencies by Virzi.  Virzi woefully misconceives our role on appeal by spending more than 50 pages of its opening brief purporting to show why the court should have rejected the testimony of Studer's witnesses on each and every item of damages.  But we "'do not reweigh evidence or

19

reassess the credibility of witnesses.'" (*In re Marriage of Balcof*, *supra*, 141 Cal.App.4th at p. 1531.) Nor will we independently "resolve inconsistencies and contradictions, if any, in the testimony of . . . witnesses." (*Sidney v. Martin Iron Works*, *supra*, 105 Cal.App.2d at p. 298.) It suffices to say Studer's experts were qualified and laid foundation for their opinions.

Moreover, the court saw Virzi's shoddy craftsmanship first-hand when it conducted a site visit. "A view by the court is evidence in the case and may alone support the findings." (*Sierra Club v. Board of Supervisors* (1981) 126 Cal.App.3d 698, 706.) And Virzi has not provided us with the trial exhibits documenting the construction work, leaving us no alternative but to presume they sufficiently support the judgment. (See *El Escorial, supra,* 154 Cal.App.4th at p. 1357; see also *Western Aggregates, Inc. v. County of Yuba*, *supra*, 101 Cal.App.4th at p. 291.)

Third, judgment was properly entered against Charles individually. It was Charles who bid the job and oversaw the work. He can be held liable for his own negligence. (See *Michaelis v. Benavides*, *supra*, 61 Cal.App.4th at p. 686 [affirming judgment against individual at cement contracting firm who "personally bid for appellants' job," "personally participated in and directed the construction," and "personally made the decisions to use cheaper materials and construction methods"].) Thus, the court could enter judgment against Charles on Studer's negligence cause of action and hold him jointly and severally liable for the approximately $150,000 in compensatory damages.

The judgment may still be affirmed even though Charles was not party to the contract between Studer and Virzi. While the court should not have entered judgment against Charles on Studer's contract cause of action, the error is harmless. (Cal. Const., art. VI, § 13.) The court imposed the same, single set of compensatory damages against Charles for breach of contract and negligence. In other words, we can affirm the judgment against Charles individually for almost $150,000 in compensatory damages on

20

Studer's negligence cause of action — and so it is immaterial whether that same judgment could be affirmed on the contract cause of action. "[T]he judgment must be affirmed "'if it is correct on any theory . . . .""" (*El Escorial*, *supra*, 154 Cal.App.4th at p. 1352.)

Fourth, the court permissibly awarded *Stearman* costs to Studer. "In *Stearman*, the court held that prevailing tort plaintiffs in a construction defect case who incurred fees for hiring experts are 'entitled to be made whole.' [Citation.] It ruled that expert fees incurred for repair or expert investigative services, that were not litigation costs, may be awarded as part of the tort damages." (*El Escorial*, *supra*, 154 Cal.App.4th at p. 1361.) Here, Studer sought and obtained almost \$35,000 in *Stearman* costs.

Virzi has waived the bulk of his challenges to the *Stearman* costs. He contends Studer should have proved his *Stearman* costs during trial, where witnesses could be called and cross-examined, rather than by filing a posttrial motion supported by declaration. But Virzi did not object when the court proposed these procedures. Quite the contrary. When Studer tried to testify at trial about what he "paid to have various experts come out to do an investigation," Virzi objected on the grounds of relevance. When Studer's counsel explained his intention to prove-up his *Stearman* costs, the court ruled, "We'll address that after trial." Virzi stood silent, acquiescing to the court's apparent decision to treat *Stearman* costs like costs of suit.

"'An appellate court will ordinarily not consider procedural defects or erroneous rulings . . . where an objection could have been but was not presented to the lower court by some appropriate method . . . . [T]he explanation is simply that it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial.'" (*Doers v. Golden Gate Bridge etc. Dist*. (1979) 23 Cal.3d 180, 184, fn. 1.) "[A]ny other rule would permit a party to trifle with the courts. The party could deliberately stand by in silence and thereby permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and

21

avoid if unfavorable." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.) If Virzi wanted Studer to prove his *Stearman* costs during trial through live witnesses, the time to raise that issue was at trial, when the court "'could easily'" correct any error. (*Doers*, at pp. 184-185, fn. 1.) Instead, Virzi objected. Its later protestations were too little, too late.

Virzi further contends its notice of appeal divested the court of jurisdiction to award the *Stearman* costs. Generally, "the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby . . . ." (Code Civ. Proc., § 916, subd. (a).)

But Virzi's notice of appeal was premature. A party may appeal "a 'judgment' that is not interlocutory, e.g., a final judgment. A judgment is the final determination of the rights of the parties [citation] ""when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined.'"" [Citations.] "'It is not the form of the decree but the substance and effect of the adjudication which is determinative. As a general test . . . it may be said that *where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final*, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties, the decree is interlocutory.'""" (*Dana Point Safe Harbor Collective v. Superior Court* (2010) 51 Cal.4th 1, 5, fn. omitted (*Dana Point*).)

Despite its label, the August 2010 "JUDGMENT" from which Virzi purported to appeal was not final. It did not """"terminate[] the litigation between the parties on the merits of the case and leave[] nothing to be done but to enforce by execution what has been determined.'""" (*Dana Point, supra,* 51 Cal.4th at p. 5.) It instead required "further . . . judicial action on the part of the court" (*ibid.*) to determine the parties' rights as to the *Stearman* costs, expressly contemplating a "motion therefor." Those rights were finally determined in the May 2011 "AMENDED JUDGMENT,"

which was the final, appealable judgment. Thus, Virzi's notice of appeal from the May 2010 judgment was premature, did not "perfect[] . . . an appeal," and imposed no stay.[7] (Code Civ. Proc., § 916, subd. (a).)

To wrap up the *Stearman* issue, we note the record adequately supports the award. Studer submitted declarations from his experts. They stated they were retained to investigate the construction defects, rule out other causes of property damage, and prepare repair cost estimates. Each attached invoice, expressly excluding any charges for trial preparation or testimony. This evidence sufficiently proves the existence and amount of the *Stearman* costs. (See *El Escorial*, *supra*, 154 Cal.App.4th at p. 1352.) Virzi has it backwards when it complains the experts failed to show the connection between their investigative costs and the trial testimony. The court cannot award *Stearman* costs for time spent on trial preparation and testimony. (*Ibid*.)

Fifth, the court permissibly awarded prejudgment interest to Studer on his negligence cause of action. "In an action for the breach of an obligation not arising from contract . . . interest may be given" as damages (Civ. Code, § 3288) "to compensate a party for the loss of the use of his or her property" (*Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 815). "[T]he trial court, when acting as the trier of fact, may award prejudgment interest under this section" (*id.* at p. 814, fn. 16) and its decision will "not be overturned unless [it] abused its discretion" (*id*. at p. 815). Studer's loss of use of the money spent on Virzi's defective work sufficiently supports the court's exercise of its discretion to award prejudgment interest. And contrary to Virzi's claim, the court could award prejudgment interest even though the amount of compensatory damages was not determined until after trial. "Even if plaintiff's damages are not liquidated, prejudgment interest may be awarded" pursuant to Civil Code section 3288. (*Bullis,* at p. 814.)

---

[7] Even so, we exercise our discretion to save Virzi's appeal by deeming its notice of appeal "'as filed immediately after entry of judgment.'" (Cal. Rules of Court, rule 8.104(d)(1); accord *Cabral v. Soares* (2007) 157 Cal.App.4th 1234, 1239, fn. 2.)

Virzi also contends the court abused its discretion because the amount of prejudgment interest does not derive from any readily apparent calculation. But Studer correctly notes the award is less than the amount supported by the record.[8] Virzi is not aggrieved by the error in its favor, and lacks standing to challenge it on appeal. (Code Civ. Proc., § 902 [only a "party aggrieved may appeal"].)

*The Attorney Fee Award May Be Affirmed As Modified*

In challenging the award of attorney fees to Studer, Virzi raises three baseless contentions — and one that has merit.

First, Virzi claims the court lost jurisdiction to award attorney fees after it appealed. But its appeal from the May 2010 judgment was premature, as already shown. (See *Dana Point, supra,* 51 Cal.4th at p. 5.)

Second, Virzi contends the contract required Studer to prove his attorney fees as damages at trial, not as costs of suit by posttrial motion. But the contract language does not alter the fundamental nature of attorney fees as costs of suit. [9]

---

[8] Studer suggests the court may have reasonably awarded 7 percent annual interest on $150,765.35 for the period between the filing of the complaint (Jan. 26, 2007) and the issuing of the statement of decision (Aug. 5, 2010). That is 1,288 days (not 1,104, as Studer asserts), which makes for $37,517.96 in prejudgment interest. The court awarded $31,929. Studer selected the proper interest rate for his example. (See *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1585 [7 percent prejudgment interest on tort damages].) But he was overly generous in excluding the *Stearman* costs from the equation, and in selecting the date upon which the prejudgment interest begins to run. "[W]here prejudgment interest is awarded under [Civil Code] section 3288 in order to compensate respondents fully for their loss, that interest must first be calculated on the entire judgment . . . from the date of the tortious act proximately causing their damages." (*Newby v. Vroman* (1992) 11 Cal.App.4th 283, 289.) Studer has not cross-appealed, though, and there is no prejudice to Virzi.

[9] The contract version attached to the attorney fee motion provided that "[i]f any legal action . . . is brought for the enforcement of this Agreement, or because of an alleged dispute . . . with any of the provisions of this Agreement, the successful or

24

"While attorney fees awarded under a contract were, at one time, considered to be an element of contract damages [citation], that view changed with the enactment of Civil Code section 1717. While intended to ensure the mutuality of any contractual attorney fees provision [citation], the statute also constituted statutory authority for the award of contractual fees. Once contractual attorney fees could be deemed awarded pursuant to section 1717, courts found them analogous to statutory attorney fees and declared them an element of costs of suit, rather than damages. [Citations.] The Legislature endorsed this view in 1981 by amending section 1717 to add language expressly characterizing contractual attorney fees as a cost of suit." (*Walker v. Ticor Title Co. of California* (2012) 204 Cal.App.4th 363, 372.) "Following the amendment of section 1717, '"attorney's fees were to be seen as allowed by statute, rather than by contract."'" (*Ibid*.) "Accordingly, while the availability of an award of contractual attorney fees is created by the contract [citation], the specific language of the contract does not necessarily govern the award." (*Id*. at pp. 372-373.) "Parties to a contract cannot, for example, enforce a definition of 'prevailing party' different from that provided in Civil Code section 1717." (*Id*. at p. 373.) Nor, we hold, may the parties require attorney fees be proved at trial as damages. The statute that allows for contractual attorney fee awards in the first place provides they are costs of suit. (Civ. Code, § 1717.)

Third, Virzi asserts the court violated a "*Mandatory Duty*" to allocate Studer's attorney fees between Studer's contract and tort claims.[10] But a party's "joinder

___

prevailing party . . . shall be entitled to recover as an element of their damages, reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which they may be entitled."

[10] Virzi does not contend the court should have allocated liability for Studer's attorney fees between Virzi and Charles. Nor does it assert Charles cannot be individually liable for them. "It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point . . . we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

of causes of action should not dilute its right to attorney's fees. Attorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed. All expenses incurred with respect to [issues common to all causes of action] qualify for award." (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129-130.)

Thus, where the issues are """"inextricably intertwined,"""" the prevailing party need not apportion attorney fees and may recover fees for all time reasonably spent. (*Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1111.) The governing test is whether the "issues are so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims for which they are not." (*Akins v. Enterprise Rent-A-Car Co*. (2000) 79 Cal.App.4th 1127, 1133.) "Where fees are authorized for some causes of action in a complaint but not for others, allocation is a matter within the trial court's discretion." (*Amtower v. Photon Dynamics, Inc*. (2008) 158 Cal.App.4th 1582, 1604.)

The record fully supports the court's conclusion that allocation was "impossible." The "basic set of facts" underlying Studer's causes of action was "interchangeable," it found — "The construction was negligent, and it was in breach of the agreement between the parties." We see no abuse of discretion.

Finally, Virzi challenges the calculation of the attorney fee award. Certainly, "the trial court has broad authority to determine the amount of a reasonable fee." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.) "'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong"' — meaning that it abused its discretion." (*Ibid*.)

The court must "ordinarily begin[] with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate." (*PLCM Group,*

26

*Inc. v. Drexler*, *supra*, 22 Cal.4th at p. 1095.) "The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided. [Citation.] Such an approach anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary." (*Ibid*.)

Here, the court's lodestar calculation needs adjustment. It awarded Studer "the sum of $288,182.50 as to the firm of Keathley and Keathley and $43,750 as to the Williams Law Firm based upon an hourly rate of $350.00 for a total attorney fee award of $331,932.50." At the hearing, it stated Keathley and Keathley's hourly rate was reasonable, and a reasonable total award should roughly correspond to the $284,000 charged to Virzi by its counsel. Thus, the court apparently intended to award the full value of Keathley and Keathley's time to Studer, and we see no abuse of discretion in that.

But Studer never sought to recover $288,182.50 for Keathley and Keathley's time. The declaration of H. James Keathley, Jr. in support of the motion for fees stated he had devoted 492.75 hours on the matter at the hourly rate of $350, excluding the time expended on the earlier appeal. The declaration of Katherine D. Keathley stated she had devoted 228 hours on the matter at the hourly rate of $350, also excluding the time worked on the earlier appeal. Thus, up to the filing of the fee motion, the Keathley firm had expended 720.75 hours at $350 per hour amounting to $252,262.50. In addition, Katherine Keathley anticipated another six hours in preparing a reply to the motion for fees and a motion to amend the judgment for another $2,100. In Studer's reply to Virzi's opposition, the Keathley firm reported an additional 27 hours, or $9,450, excluding appeal and bankruptcy issues. And in Studer's separate motion for attorney fees incurred on the prior appeal, Katherine Keathley stated she had worked 21 hours on the appeal and requested an additional $7,350.00. Thus, the total requested by the Keathley firm added up to $271,162.50 — $17,020 less than the award. Nothing in

27

the record suggests any reasonable basis to augment the award by $17,020 or to apply a multiplier to the lodestar. The attorney fee award must be reduced accordingly. (See Code Civ. Proc., § 43 [court may modify judgment on appeal].)

## DISPOSITION

The judgment is reduced by $17,020 to $549,190.85. As modified, the judgment is affirmed. In the interest of justice, defendants shall recover their costs on appeal.

IKOLA, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

THOMPSON, J.

28