Filed 11/10/22  N.R. v. San Bernardino County Children and Family Services CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| N.R., A MINOR, etc., | |
| Plaintiff and Appellant, | E074418 |
| v. | (Super.Ct.No. CIVDS1416377) |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Bryan F. Foster, Judge.  Affirmed.[1]

The Ehrlich Law Firm and Jefffrey I. Ehrlich; The Vartazarian Law Firm, Steven R. Vartazarian and Matthew J. Whibley for Plaintiff and Appellant.

---

[1] We dismiss the cross-appeal as moot.

1

Michelle D. Blakemore, County Counsel and Blakney A. Boggs, Deputy County Counsel; Dolen, Tucker, Tierney & Abraham and Raymond F. Dolen; Greines, Martin, Stein & Richland and Timothy T. Coates for Defendant and Appellant.

After investigating a referral for possible child abuse, a social worker for the San Bernardino County Child and Family Services (the County or CFS) determined the allegations were unfounded due to lack of current evidence of abuse, but recommended parenting classes for Christopher R., the father, and Hannah T., his girlfriend, to avoid a risk of potential harm to the child, N., because they had admitted to using corporal punishment on the child in the past. Six months later, the child suffered a catastrophic head injury at the hands of the girlfriend which left the child severely disabled. The child was removed from the father and placed in the custody of his mother, Laurel R.,[2] who sued the County for breach of a mandatory duty to open a case file and investigate collateral contacts. Following trial, a jury found the County was 85 percent liable for the injuries to the child. The County filed a motion for judgment notwithstanding the verdict (JNOV) and, alternatively for a new trial. The court granted both motions. Plaintiff, as guardian ad litem for the child, appealed. The County cross-appealed from the original judgment in favor of plaintiff.

On appeal, plaintiff argues that the trial court erred in granting the motion for JNOV by (a) relying on an erroneous construction of the County's legal duties and (b)

---

[2] Plaintiff's mother's first name is variously spelled "Laurell," as in the plaintiffs' pleadings, and "Laurel" in the record (the trial court's rulings, and plaintiffs' Notice of Appeal). Because plaintiffs' counsel filed the notice of appeal with the spelling, "Laurel," we will use that spelling for convenience.

improperly resolving factual issues in the County's favor.  The County argues by way of cross-appeal that if the orders are procedurally defective, the County is entitled to a new trial.  We affirm the trial court's grant of defendant's motions and dismiss defendant's appeal.

## BACKGROUND

Laurel R. was previously married to Christopher R., and the couple had a child, N., who was born in 2008, while the couple lived in North Carolina where Christopher, a Marine, was stationed.  The couple subsequently divorced and Christopher assumed physical custody of N.  When Christopher was transferred to Twentynine Palms, N. moved with him, as well as his girlfriend Hannah T. Christopher was an air traffic controller for the Marines and had been transferred to San Bernardino County.

On September 2, 2013, an ex-roommate of Christopher and Hannah's made a report of abuse and neglect of N. on the San Bernardino County Child and Family Services (CFS or County) Child Abuse Hotline.  The report indicated that Hannah locked N. in his room all day causing him to defecate and urinate in the room and that N. was fed only vegetables, but his food would be taken away as punishment.  The door to N.'s room locked from the outside so N. could not exit the room.  When he defecated on himself, he was given a cold shower.  The caller also indicated he was verbally abused, had dark circles around his eyes, and that Hannah used a drumstick to beat N.

In response to this report, Luz Campas investigated the allegations on September 2, 2013.  Campas found no prior history, and, when she examined N. during an

3

unannounced visit, he appeared well-nourished and groomed, his room was appropriate, and no feces were found. Her report also noted that the house was adequate, there was more than ample furniture and food in the home, N. appeared to be comfortable with his parents and did not fear them. There were no visible marks or bruises on N. and his skin was fair. Social worker Campas concluded the allegations were unfounded.

After this experience with child welfare authorities, Hannah's mother, Rachel K., arranged for Hannah and N. to visit her in Oregon on the same day that Campas and Deputy Hess did their investigation because Hannah was overwhelmed. While in Oregon, Hannah's mother, Rachel, observed that the relationship between Hannah and N. was troubling, that Hannah was overly harsh and critical of N., and that she was too controlling. Rachel also observed bruising on N. from head to toe.

In addition, Rachel's son informed Rachel he had seen Hannah hose down N. outside and beat him with a wooden spoon. Rachel contacted Christopher by phone to express her concern about N.'s treatment. Rachel also spoke with Hannah, recommending that N. stay with Rachel and that Hannah get mental health care. However, Hannah became upset and left her mother's home several days earlier than planned.

On September 27, 2013, Rachel telephoned the Yucca Valley police department because she worried nothing would be done to protect N. She reported observing Hannah take N.'s food away and that N. appeared severely underweight. Deputy Bailey responded to that call and went to the home to interview and examine N. N. informed

4

Deputy Bailey that when he peed or pooped in this diaper, Hannah hit him in the head and face and beat him with a drumstick on his butt and face, even pointing to the drumstick that Hannah used, and then gave him a cold bath. He also indicated she beat him up and it hurt everywhere. N. also informed the deputy that Hannah took away his food as punishment because he picked up his hotdog with his hand.[3] Deputy Bailey reported to the Hotline that Hannah hit N. with spoons, hangers, and a spatula all over his body and that Christopher allowed his son to stay at home alone with Hannah.

In response to this second referral, social worker Karen Perry went to the home on October 1, 2013, but did not meet with Christopher or Hannah until October 6, 2013.[4] During the interview, N. told Perry he felt safe at home and denied anything scary happened to him. Perry found N. to be "bright in affect and thin" with "good skin pal[l]or," except under his eyes. Hannah and Christopher were also interviewed, and denied withholding food, but informed Perry that N. behaved strangely, urinating on his toys, defecating and smearing his feces. Both Christopher and Hannah admitted Hannah had occasionally used corporal punishment with N. by using a drum stick to spank him on the buttocks, and on one occasion they observed a bruise from such a spanking.

---

[3] In her deposition testimony (which was introduced at trial), Hannah admitted that N. was clearly malnourished and was so skinny they did not want to take him to the store, even.

[4] Perry's first attempt to have a face-to-face meeting was on October 1, 2013, but a roommate informed Perry that Christopher was not at home and Hannah was in bed. She left her card and Christopher telephoned Perry the next day, when a home visit was arranged.

Thereafter, they stopped using corporal punishment, and, instead, disciplined N. with time-outs.

Perry physically examined N.'s body but found no signs of bruising or trauma.[5] The house was above minimal standards and there were no signs of abuse or neglect. N. denied anything scary, indicated he felt safe at home and that he was punished by being made to sit against the wall in time out. However, she thought parenting classes might be helpful to the couple because they acknowledged corporal punishment had been used until a few weeks prior to Perry's visit, when Christopher indicated he had seen a bruise and had not realized N. bruised easily. As a result, the couple currently used time outs of 5 minutes in duration. Because the couple had used physical punishment in the past, Perry provided them with some brochures about parenting classes, but did not mandate that they attend. Because there was no current evidence of abuse or neglect, Perry determined that the allegations were unfounded, and closed the file.

In the meantime, N. was examined in December 2013 and January 2014 by a doctor, who is a mandated reporter, in connection with N.'s circumcision, and the doctor did not indicate any signs of malnutrition or abuse.

On May 18, 2014, more than six months after Perry's home inspection, N. was admitted to the hospital with a large acute subdural hematoma and was in a coma. He was also diagnosed with nonorganic failure to thrive when admitted to the hospital.

---

[5] In February of 2014, plaintiff came to California to see N. and observed no signs of abuse or neglect, either.

Hannah severely injured N. while Christopher was not present in the home.[6] His face and body were covered with bruises, but Hannah told her mother he fell off a stool and hit his head on the floor. N. suffered catastrophic permanent injuries as a result of the beating, for which Hannah was arrested for violating Penal Code section 273a, subdivision (a), leading to her conviction and sentence of 15 years in prison. Christopher was charged and pled guilty to a misdemeanor charge of violating Penal Code section 273a, subdivision (a).[7]

Physical custody of N. was awarded to Laurel, who then filed her lawsuit against the County for recovery for injuries sustained by N. after the County allegedly failed to perform mandatory duties set forth in the Child Welfare Services Manual of Policies and Procedures, sections 31-101.5 and 31-125.5. Following trial, the jury returned a special verdict in favor of plaintiffs: The special verdict awarded $602,625.66 for past economic damages; $9,900,000.00 for future economic loss, $2,900,000.00 for future loss of earning capacity, $15,000,000.00 for past noneconomic loss, and $85,000,000.00 for future noneconomic loss. The jury assessed fault as follows: the County was 85 percent

---

[6] The agency of the injuries is unknown because statements attributed to Hannah regarding the abuse on this occasion were not included in the excerpt of the deposition testimony introduced at trial.

[7] There is nothing in the record supporting the statement about this conviction; the only "evidence" we have of Christopher's conviction is a vague statement by Hannah about his arrest during her deposition testimony, and counsel's opening statement. This fact appears to be undisputed so we refer to it here, but it is actually a matter outside the record on appeal where no competent evidence of the conviction appears in the record.

at fault, Christopher was 10 percent at fault, and Hannah was 5 percent at fault. Judgment was entered accordingly.

On September 6, 2019, the County made motions for judgment notwithstanding the verdict and, alternatively, for a new trial. Plaintiff opposed the motions. On October 30, 2019, the trial court issued its rulings granting both motions. Specifically, the court found that there was no substantial evidence that the closure of the referral by Perry fell outside the her discretion or that it was a violation of her mandatory duty where she determined the allegations were unfounded. It also concluded that the evidence showed Perry's full compliance with the mandatory duties, such that there was no substantial evidence to support the jury's finding of a violation of mandatory duties.

As for the motion for new trial, the court granted the motion because the jury's apportionment of 85 percent of the fault to the County was unreasonable and punitive, and because there was insufficient evidence that Perry violated a mandatory duty where, in the exercise of a social worker's discretion, she determined the allegations were unfounded. Plaintiff timely appealed and defendant cross-appealed from the original judgment.

## DISCUSSION

A. *Plaintiff's Appeal.*

1. *The Trial Court Properly Granted the Motion for JNOV.*

Plaintiff argues that the court erred in granting the County's motion for JNOV because the trial court relied on an erroneous construction of the county's legal duties and

improperly resolved disputed factual issues in the County's favor. Regarding the claim of erroneous construction of the mandatory duties, plaintiff alleges that (a) Perry's designation of the allegations she investigated as "unfounded," was not entitled to weight; (b) the trial court applied the wrong standard in concluding that Perry complied with mandatory duties; and (c) even if Perry's "unfounded" determination is credited, that did not excuse her failure to open a case plan. We disagree.

      a.     *General Principles Governing Motions for JNOV*.

A motion for JNOV may be granted only if a motion for a directed verdict should have been granted. (Code Civ. Proc., § 629, subd. (a)). "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68, citing *Hauter v. Zogarts* (1975) 14 Cal. 3d 104, 110.)

"The power of the court to direct a verdict is subject to the same limitations as its power to grant a nonsuit." (*Reynolds v. Willson* (1958) 51 Cal.2d 94, 99, citing *Pellett v. Sonotone Corp.* (1945) 26 Cal.2d 705, 708 [overruled on a different point in *Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 302].) A nonsuit may be granted only where, disregarding conflicting evidence on behalf of the defendants, and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination

that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.

"'"'The granting of a motion for nonsuit is warranted when, disregarding conflicting evidence, giving plaintiff's evidence all the value to which it is legally entitled, and indulging in every legitimate inference that may be drawn from the evidence, the trial court determines that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff."  [Citations.]  [¶]  Plaintiff cannot prevail unless he can demonstrate *substantial* evidence in the record to support each claim asserted.  Mere conjecture or nonsensical interpretations of evidence are not sufficient to overturn a nonsuit.'"  (*Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675, 684, quoting *Kidron v. Movie Acquisition Corp*. (1995) 40 Cal.App.4th 1571, 1580; see also *Ritschel v. City of Fountain Valley* (2006) 137 Cal.App.4th 107, 115.)

Thus, "'"[a] motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.  [Citation.]  [¶]  . . . As in the trial court, the standard of review [on appeal] is whether any substantial evidence— contradicted or uncontradicted—supports the jury's conclusion."'"  (*Webb v. Special Electric Co., Inc*. (2016) 63 Cal.4th 167, 192, quoting *Cabral v. Ralphs Grocery Co*. (2011) 51 Cal.4th 764, 770.)

Regarding situations in which motions for JNOV and for new trial are both granted, if the court grants a motion for judgment notwithstanding the verdict and

10

likewise grants the motion for a new trial, the order granting the new trial shall be effective only if, on appeal, the judgment notwithstanding the verdict is reversed, and the order granting a new trial is not appealed from or, if appealed from, is affirmed." (Code of Civ. Proc., § 629, subd. (d); *Beavers v. Allstate Ins. Co*. (1990) 225 Cal.App.3d 310, 330.) "The obvious import of this quoted language of [Code of Civil Procedure] section 629 is that an order granting the new trial is contingent upon the result of the appeal of the JNOV; that is, the order is not effective unless and until the JNOV has been reversed on appeal, and is moot if the JNOV is affirmed on appeal, and several cases have so held." (*Cobb v. University of So. California* (1996) 45 Cal.App.4th 1140, 1146.)

On appeal, we are bound to view the evidence in the light most favorable to the party securing the verdict, unless our review of the record discloses no evidence nor any reasonable inference therefrom which supports the jury's verdict. (See *Hauter v. Zogarts* (1975) 14 Cal.3d 104, 111.) "When the issue raised is whether sufficient evidence supports the jury's factual findings, appellate courts apply the substantial evidence standard." (*Cleveland v. Taft Union High School Dist*. (2022) 76 Cal.App.5th 776, 802, citing *Hauter v. Zogarts, supra,* 14 Cal.3d at p. 110.) "Alternatively, when the appeal raises purely legal questions, appellate courts apply the independent (i.e., de novo) standard of review. (*Cleveland v. Taft Union High School Dist*., *supra*, at p. 802, citing *Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1045 ["all facts essential to issue of ostensible agency were undisputed; jury's finding of ostensible agency was contrary to the law; judgment was reversed"].)

11

In the present matter, facts are not in dispute. The primary issue is whether Perry violated a mandatory duty specified in the statutes governing duties of child welfare workers and the regulations and policies and procedures that specify the manner of their investigations. As matters of statutory construction, we review de novo. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.)

b. *Mandatory Duties of Child Welfare Professionals in Investigating Allegations of Abuse or Neglect.*

Plaintiff argues the trial court erred in granting the JNOV because the jury properly found that Perry violated mandatory duties, thereby exposing the County to liability. To properly address this question, we must determine what her mandatory duties were.

The Child Abuse and Neglect Reporting Act (CANRA; Pen. Code, § 11164 et seq.) was enacted to protect children from abuse and neglect by increasing the communication and sharing of information relating to child abuse and neglect among the agencies responsible for the welfare of children. (Pen. Code, §§ 11166.3, subd. (a), 11164, subd. (b).)

To accomplish this, CANRA designates certain agencies to accept reports of alleged child abuse or neglect and to cross-report the information contained therein to other agencies. (Pen. Code, § 11166; *B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 174.)

12

Under CANRA, when an agency receives a report of suspected abuse or neglect from a mandatory reporter,[8] it is required to accept the report (Pen. Code, § 11165.9) and it is also required to cross-report the allegation to the county welfare or probation department. (Pen. Code, § 11166, subd. (k).) Once a report is made, responsibilities shift and other governmental authorities take over. (*James W. v. Superior Court* (1993) 17 Cal.App.4th 246, 254.) The Act is a reporting scheme to increase the likelihood that child abuse is identified and reported to authorities for investigation. (*Ferraro v. Chadwick* (1990) 221 Cal.App.3d 86, 90.) Other provisions of CANRA specify different obligations and procedures for the reporting of investigations. (Pen. Code, §§ 11166.3, subd. (a), 11169, subd. (a).) The child welfare agency for the county is then tasked with investigating the allegation or report to determine if the child requires protection.

The duty imposed on child welfare service professionals to investigate referrals pertaining to abuse or neglect involve policies and procedures found in the California Department of Social Services (DSS) Manual of Policies and Procedures, enacted pursuant to Welfare and Institutions Code section 16501. The policies and procedures may therefore qualify as enactments which create a public entity duty. (See *Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 134 [breach of mandatory duty found to exist where social worker visited dependent child in placement only three times in 10 months, rather than on monthly basis as required by DSS Manual of Policies and

---

[8] Hannah's mother, who initiated the report to the Yucca Police Department, is a mandatory reporter. Likewise, Deputy Bailey is a mandated reporter, insofar as law enforcement officers are designated as such under CANRA, and are required to cross-report to the child welfare agency. (Pen. Code, § 11166, subd. (k); Gov. Code, § 815.6.)

13

Procedures regulation 30-342 (predecessor of reg. 31-320), no investigation was conducted of allegations of physical abuse, and child was subsequently severely injured by caregiver].)

Respecting the investigation of allegations, a social worker is required to conduct an in-person investigation of allegations when a referral is made by a law enforcement agency. (Man. Policies & Proc., § 31-110.4.) This in-person investigation may be conducted immediately or within 10 days. (*Ibid.*) In conducting the investigation, the social worker shall determine the potential for, or the existence of, any conditions that place the child at risk and in need of services, and which would cause the child to be a person described by Welfare and Institutions Code, section 300, subdivisions (a) through (j). (Man. Policies & Proc., § 31-125.1.)

The social worker shall have in-person contact with all children alleged to have been abused or at risk of abuse, and at least one person who has information regarding the allegations. (Man. Policies & Proc., § 31-125.2.) If the social worker determines the referral (or allegation) is unfounded pursuant to Penal Code section 11165.12, the social worker shall document that information. (Man. Policies & Proc., § 31-125.21.) If the social worker does not determine the allegations are unfounded, then the social worker is required to make necessary collateral contacts. (Man. Policies & Proc., §§ 31-125.22, 31-125.221.)

Plaintiffs assert that Perry's testimony about the reasons for recommending parenting classes indicated that she found the allegations inconclusive, rather than

14

unfounded, and thus required contact with collateral sources and a case plan. However, this assertion is not supported by the record. In plain language, Perry found the allegations unfounded. Perry stated that she provided brochures about parenting classes due to the parents' admission of recent corporal punishment, which Perry felt would benefit the parents.

The only reasonable interpretation of Perry's conclusions and her testimony is that voluntary parenting classes would educate the parents about age-appropriate discipline and did not indicate there was a risk of physical abuse that might bring the child within the provisions of Section 300. As Perry herself testified, she recommended the services to build on their strengths, which had included the decision to no longer use corporal punishment. In and of itself, age-appropriate discipline, including spanking, is not a ground for intervention by the social services agency or the court system. (See Welf & Inst. Code, § 300, subd. (a).) Thus, after Perry contacted N. and his father regarding the allegations and completed the in-person investigation, she concluded the allegations were unfounded, but recommended voluntary parenting education due to Hannah's admission of past corporal punishment and to prevent abuse, not because there was a current risk of abuse. The fact Perry recommended voluntary services did not alter her finding that the allegations were unfounded at the time of her investigation and nothing in the record supports the inference that she found a risk of abuse. Without such a finding, there was no mandatory duty to make further or collateral contacts.

The social worker's determination, following an investigation, is key to the existence of other or further mandatory duties. Penal Code section 11165.12 sets out the governing definitions pertaining to the results of a child welfare investigation. Based on the terminology used in the CANRA, an investigation of child abuse may result in a report with one of three possible findings: unfounded, substantiated or inconclusive. An "'[u]nfounded report' means a report that is determined by the investigator who conducted the investigation to be false, to be inherently improbable, to involve an accidental injury, or not to constitute child abuse or neglect . . . ." (Man. Policies & Proc., §§ 31-125.22, 31-125.221, Pen. Code, § 11165.12, subd. (a).) A "'[s]ubstantiated report' means a report that is determined by the investigator who conducted the investigation to constitute child abuse or neglect . . . based upon evidence that makes it more likely than not that child abuse or neglect . . . occurred." (*Id.,* Pen. Code, § 11165.12, subd. (b).) An "'[i]nconclusive report' means a report that is determined by the investigator who conducted the investigation not to be unfounded, but the findings are inconclusive and there is insufficient evidence to determine whether child abuse or neglect . . . has occurred." (*Id.*, Pen. Code, § 11165.12, subd. (c); *Saraswati v. County of San Diego* (2011) 202 Cal.App.4th 917, 921.)

While the duty to investigate is mandatory, "the decisions of child welfare agency employees — regarding determinations of child abuse, the potential risk to a child, placement of a child, removal of a child, and other resultant actions — are subjective *discretionary* ones that are incidental to the employees' investigations." (*B.H. v. County*

16

*of San Bernardino, supra,* 62 Cal.4th at pp. 191-192, citing *Christina C. v. County of Orange* (2013) 220 Cal.App.4th 1371, 1381 ["a public employee is not liable for an injury resulting from his act or omission [that] was the result of the exercise of the discretion vested in him, whether or not such discretion be abused"]; *Ortega v. Sacramento County Dept. of Health & Human Services* (2008) 161 Cal.App.4th 713, 725, 728, 733 [the immunity applies even to "lousy" decisions in which the worker abuses his or her discretion, including decisions based on "woefully inadequate information]; *Ronald S. v. County of San Diego* (1993) 16 Cal.App.4th 887, 897 ["The nature of the investigation to be conducted and the ultimate determination of suitability of adoptive parents bear the hallmarks of uniquely discretionary activity."].) Perry's determination that the allegations were unfounded, following the discharge of her mandatory duty to investigate, was a discretionary decision that has historically been recognized as discretionary.

Plaintiff asserts that Perry had a mandatory duty to make collateral contacts and to develop a case plan, which she violated and for which the County may be held liable. However, this assertion assumes that Perry's investigation found the allegations or the referral to be either substantiated or inconclusive. The record evidence does not support this assumption and undermines plaintiff's argument. Perry's conclusion was that the allegations were unfounded. We, like the trial court, are not free to ignore this critical fact.

At oral argument, plaintiff's counsel asserted we employed the wrong definition of abuse or neglect under the Penal Code section. However, under the Penal Code, CANRA recognizes five categories of "child abuse," two of which are relevant in this case. "The first, "'willful harming or injuring of a child,'" is defined as 'willfully caus[ing] or permit[ting] any child to suffer, or inflict[ing] thereon, unjustifiable physical pain or mental suffering.' [Citation] The second, "'unlawful corporal punishment or injury,'" is defined as 'willfully inflict[ing] upon any child any cruel or inhuman corporal punishment or injury resulting in a traumatic condition.' [Citation.]" (*Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 85.)

The Penal Code sections comprising CANRA also recognize that spanking a child with a wooden spoon that leaves bruising is not necessarily child abuse. (*Gonzalez v. Santa Clara County Dept. of Soc. Svcs., supra,* 223 Cal.App.4th at pp. 92-93.) CANRA was aimed at criminal conduct (*id.,* at p. 89), which runs counter to plaintiff's argument that it was intended to have a broader meaning than the Welfare and Institutions Code. While visible bruising demarcates, or at least very nearly approaches, the outer limit for the quantum of "damage" to be tolerated, it does not necessarily compel a finding of abuse unless there are grounds to find that the parent intended to inflict bruises, knew his or her conduct would do so, or should have known that bruises were likely to result from the amount of force applied and the method of its application. (*Id.*, at p. 93.)

Thus, the social worker's mandatory duties, based on the Child Welfare Services Manual and the Manual of Policies and Procedures governing Social Service Standards,

18

are dependent on whether, at a minimum, the parents conduct brings a child within the definitions under the Welfare and Institutions Code, which contains a broader definition of abuse, insofar as it does not actually require the infliction of physical harm; rather it requires only a risk of harm. The standards governing a social worker's mandatory duties require a finding that circumstances currently exist which would cause the child to be a person described by Welfare and Institutions Code, section 300, subdivisions (a) through (j). (Man. Policies & Proc., § 31-125.1.) Under circumstances where, in the social worker's judgment, based on circumstances present at the time of the in-person investigation, the allegations were unfounded, there was no mandatory duty to make collateral contacts. Plaintiff's references to her report as "inconclusive" are therefore not supported by the evidence. In other words, there is no mandatory duty to contact collateral sources if the social worker determines the allegations are unfounded.

      c.     *Having Determined the Allegations were "Unfounded," There was No Mandatory Duty to Develop a Case Plan.*

Plaintiff also argues that Perry had a mandatory duty to create a case plan. This assertion is likewise misplaced.

If a social worker determines that child welfare services are necessary or that the child comes within the court's dependency jurisdiction, the social worker must complete an assessment and develop a case plan for the child. (Man. Policies & Procedures, §§ 31-201.1, 31-201.11, 31-201.111.) Of prime importance is the language of the policy provision which requires the social worker to determine the necessity for child welfare

19

services. As indicated, this determination is a discretionary act by a social worker. (*B.H. v. County of San Bernardino, supra,* 62 Cal.4th at pp. 191-192.) The record demonstrates the social worker determined, based on current circumstances apparent during the in-person investigation, that the child did not come within the description of a child within the court's dependency jurisdiction, and did not find a substantial risk of abuse.

Before jurisdiction is established through a finding that a minor is a person described by Welfare & Institutions Code section 300, a juvenile court's authority to issue orders against a parent is limited and does not include the power to issue orders that a parent participate in any services. (*In re E.E.* (2020) 49 Cal.App.5th 195, 202, citing *In re Jody R.* (1990) 218 Cal.App.3d 1615, 1622–1623; Welf. & Inst. Code, §§ 319, 323.) "If a juvenile court determines that drug testing is warranted before jurisdiction, [Welfare and Institutions Code,] section 319 gives the court authority to order the *social services agency* to provide testing referrals. (See Welf. & Inst. Code, § 319, subd. (g) ["If a court orders a child detained, the court shall . . . order services *to be provided* as soon as possible to reunify the child and [his or her] family, if appropriate" (italics added)].) [Welfare and Institutions Code] section 319 does not, however, authorize the court to order the parents to make use of those referrals." (*In re E.E., supra*, 49 Cal.App.5th at p. 202.)

Thus, unless a child is found to be a person at risk of abuse or neglect by a social worker following an in-person investigation, and unless a petition is filed and the court makes jurisdictional findings, the power of the court – and, as its adjunct, the County

social services department, cannot require a parent to participate in any child welfare services.

Nevertheless, the provision of voluntary services is authorized by section 300 of the Welfare and Institutions Code: "It is the intent of the Legislature that this section not disrupt the family unnecessarily or intrude inappropriately into family life, prohibit the use of reasonable methods of parental discipline, or prescribe a particular method of parenting. Further, this section is not intended to limit the offering of voluntary services to those families in need of assistance but who do not come within the descriptions of this section. To the extent that savings accrue to the state from child welfare services funding obtained as a result of the enactment of the act that enacted this section, those savings shall be used to promote services which support family maintenance and family reunification plans, such as client transportation, out-of-home respite care, parenting training, and the provision of temporary or emergency in-home caretakers and persons teaching and demonstrating homemaking skills." (Welf. & Inst. Code, § 300, subd. (j).)

Thus, where a social worker determines that the allegations are unfounded, voluntary services may be offered, but are not necessary. (Welf. & Inst. Code, § 300; Man. Policies & Proc., §§ 31-125.21, 31-125.4.)

Plaintiff emphasizes that despite the conclusion that the allegations were unfounded, the social worker determined there was "some risk" posed by the corporal discipline that Christopher and Hannah admitted using, and this determination gave rise to a mandatory duty. However, the social worker's statement did not import that she

21

believed N. was at risk of meeting the definition of a dependent child pursuant to Welfare and Institutions Code section 300, such as would result in a finding that the allegation was substantiated. She expressly found that no such circumstances existed at the time of the investigation and that child welfare services were not necessary. But, recognizing that Hannah had admitted spanking N. with a drumstick, which left marks in the past, Perry recommended parenting classes to Christopher and Hannah as a preventive measure and to build on the family's strengths.

Because services were determined to be unnecessary, no case plan was mandated by either the Welfare and Institutions Code or the Manual of Policies and Procedures.

It is indeed tragic that no signs of abuse or neglect were present when Perry made her in-person investigative visit. But she followed the protocols and complied with the mandatory duties set forth in the Welfare and Institutions Code and the Manual of Policies and Procedures. After conducting her investigation, she concluded the allegations were unfounded due to lack of current evidence.[9] Absent any existing or potential risk of serious physical harm, her determination that child welfare services were unnecessary was appropriate. Her conclusion, as provided in all the authorities, was a

---

[9] "Current" evidence of abuse is required because juvenile court dependency jurisdiction may not be grounded solely on past acts; there must be some basis to conclude the abuse will continue in the future. And the purpose of the investigation by the child welfare agency is to determine if the child is in need of protection due to the existence of or potential for abuse or neglect. "Evidence of past conduct, without more, is insufficient to support a jurisdictional finding under section 300. There must be some reason beyond mere speculation to believe the alleged conduct will recur." (*In re James R.* (2009) 176 Cal.App.4th 129, 136, citing *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394.)

discretionary act, based on the circumstances presented at the time of her investigation. Perry did not violate a mandatory duty by not developing a case plan. Indeed, when allegations are deemed to be unfounded, and child welfare services are determined to be unnecessary in the discretion of the social worker, there was not even a mandatory duty to offer voluntary services.

d.     *Because Perry was Not Under a Mandatory Duty to Further Investigate Allegations She Determined Were Unfounded, the County is Immune.*

Under the Government Claims Act (Gov. Code, § 810 et seq.), governmental tort liability must be based on statute. "Except as otherwise provided by statute: [¶] . . . [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." (Gov. Code, § 815, subd. (a)); *B.H. v. County of San Bernardino, supra*, 62 Cal.4th at p.179, citing *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 899.)

However, Government Code section 815.6 provides a statutory exception to the general rule of public entity immunity by providing: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (Gov. Code, § 815.6.)

"Government Code section 815.6 has three elements that must be satisfied to impose public entity liability: (1) a mandatory duty was imposed on the public entity by

an enactment; (2) the enactment was designed to protect against the particular kind of injury allegedly suffered; and (3) the breach of the mandatory statutory duty proximately caused the injury." (*B.H. v. County of San Bernardino, supra,* 62 Cal.4th at p.179.) "Even when a duty exists, California has enacted specific immunity statutes that, if applicable, prevail over liability provisions. [Citation.] The first question always is whether there is liability for breach of a mandatory duty. [Citation.] If there is no liability, the issue of immunity never arises." (*Ibid.*)

A public entity may be liable for failure to discharge "a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury . . . unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (Gov. Code, § 815.6.) In an action against a public entity, "[o]ne of essential elements that must be pled is the existence of specific statutory duty." (*Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1458.) "[A] negligence per se claim against a public entity is the same as a breach of mandatory duty cause of action." (*O'Toole v. Superior Court* (2006) 140 Cal.App.4th 488, 510, fn. 12.)

In the present case, the social worker discharged her mandatory duties, and, finding no current evidence of abuse or neglect, concluded the allegations were unfounded. This determination was a discretionary determination as there exists no mandatory duty on the part of a social worker to draw any particular conclusion after conducting an in-person investigation.

Because the allegations were unfounded, based on the lack of current evidence of abuse or neglect, the social worker, in her discretion, determined that child welfare services were not "necessary." As such, there was no mandatory duty to develop a case plan. The trial court correctly determined that Perry did not violate a mandatory duty, such as would render the County liable.

B.    *County's Appeal*

The County appeals the original verdict of liability that resulted in a judgment against it. It argues only that if we were to determine the trial court's rulings were procedurally defective, we should order a new trial for defendant. However, the trial court granted the County's motion for JNOV, so that verdict and the judgment based thereon has been vacated. Where the subject order or judgment has been set aside by the trial court, an appeal must be dismissed as moot. (*People v. West Coast Shows, Inc.* (1970) 10 Cal.App.3d 462, 464; see also, *El Escorial Owners' Assn. v. DLS Plastering Inc.* (2007) 154 Cal.App.4th 1337, 1367; *Andrisani v. Saugus Colony Ltd.* (1992) 8 Cal.App.4th 517, 523.) The County's appeal is therefore moot.

The trial court already granted the County's motion for new trial, along with the JNOV, so there is no need for us to review whether it should be granted. As indicated above, in the situation where the trial court grants both a JNOV and a new trial, the new trial "shall be effective only if, on appeal, the judgment notwithstanding the verdict is reversed, and the order granting a new trial is not appealed from or, if appealed from, is

25

affirmed."  (Code of Civ. Proc., § 629, subd. (d).)  Because that issue has been ruled on previously, it also is moot.

The appeal is moot and subject to dismissal.

**DISPOSITION**

The judgment is affirmed.  The cross-appeal is dismissed.  The County is awarded costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

CODRINGTON

J.

RAPHAEL

J.